U.S. DISTRICT COURT
CLERK
03 SEP 30 PM 4:22

FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED
OCT 01 2003

|  |  |  |
|---|---|---|
| ROGER FAIRLEY and RICHARD GACKOWSKI, | ) ) ) | |
| Plaintiffs, | ) ) | |
| -vs- | ) ) ) | Case No. 03 C 5207 |
| SUPT. DENNIS ANDREWS; LT. EDWARD BYRNE; SGT. PATRICK LOIZON; OFC. EVAN FERMAINT; OFC. NOBERTO BERCASIO; OFC. FRED COFFEY; OFC. RONALD PROHASKA; INVESTIGATOR, GREGORY ERNST; FORMER CHIEF INVESTIGATOR, SAUL WEINSTEIN; CHIEF INVESTIGATOR, TIM KAUFMAN; OFC. GABRIEL OCHOA; CHIEF INVESTIGATOR, JUAN DIAZ, in their individual and official capacities; SHERIFF MICHAEL SHEAHAN, in his official capacity; and COOK COUNTY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge Castillo |
| Defendants. | ) ) | |

## FIRST AMENDED COMPLAINT

### Nature of the Case

1.     This is a case about two individuals who did the right thing. Instead of being commended, they were harassed, threatened, intimidated, and forced out of their jobs. Plaintiffs Roger Fairley and Richard Gackowski have been deprived of their basic civil rights by government officials whose duties include upholding the law and protecting the civil rights of others. Plaintiffs bring this Complaint pursuant to 42 U.S.C. §§ 1983 and 1985(2), and the laws of the State of Illinois, to redress violations of their rights under the First and Fourteenth

Amendments of the United States Constitution. Plaintiffs, former Cook County Correctional Officers, spoke out and attempted to speak out on a matter of public concern -- the use of excessive force by correctional officers on inmates -- and as a result suffered a campaign of harassment and retaliation by the Defendants in violation of § 1983. Defendants further conspired to obstruct the due course of justice with an intent to deny the Plaintiffs the equal protection of the laws in violation of § 1985(2). Defendants' conduct, which culminated in a threat of bodily harm against Plaintiffs, was extreme and outrageous and was intended to and did cause Plaintiffs severe emotional distress in violation of the laws of the State of Illinois.

## Parties

2.      Plaintiff, Roger Fairley, is a citizen of the United States and a citizen and resident of the Northern District of Illinois. From October 31, 1994 to February 4, 2003, Plaintiff Fairley was employed at the Cook County Department of Corrections ("CCDOC") as a correctional officer.

3.      Plaintiff, Richard Gackowski, is a citizen of the United States and a citizen and resident of the Northern District of Illinois. From June 12, 1995 to February 4, 2003, Plaintiff Gackowski was employed at the CCDOC as a correctional officer.

4.      Defendant, Dennis Andrews, has been the Superintendent of Division One of the CCDOC from approximately August 2000 to the present. He is sued in his individual and official capacity.

5.      Defendant, Edward Byrne, was at all times pertinent to the allegations of this Complaint a correctional officer holding the rank of Lieutenant with the CCDOC. He is sued in his individual and official capacity.

2

6.     Defendant, Patrick Loizon, was at all times pertinent to the allegations of this Complaint a correctional officer holding the rank of Sergeant with the CCDOC. He is sued in his individual and official capacity.

7.     Defendant, Evan Fermaint, was at all times pertinent to the allegations of this Complaint a correctional officer with the CCDOC. He is sued in his individual and official capacity.

8.     Defendant, Noberto Bercasio, was at all times pertinent to the allegations of this Complaint a correctional officer with the CCDOC. He is sued in his individual and official capacity.

9.     Defendant, Fred Coffey, was at all times pertinent to the allegations of this Complaint a correctional officer with the CCDOC. He is sued in his individual and official capacity.

10.     Defendant, Ronald Prohaska, was at all times pertinent to the allegations of this Complaint a correctional officer with the CCDOC. He is sued in his individual and official capacity.

11.     Defendant, Gregory Ernst, was at all times pertinent to the allegations of this Complaint an investigator with the Internal Affairs Division of the CCDOC ("IAD"). He is sued in his individual and official capacity.

12.     Defendant, Saul Weinstein, was the Chief Investigator of the IAD from at least July 2000 until late 2002, when he was replaced by Defendant Diaz. He is sued in his individual and official capacity.

13.     Defendant, Tim Kaufman, was at all times pertinent to the allegations of this Complaint an investigator with the Cook County Sheriff's Police Department. In or about March

2003, he was assigned the position of Chief of IAD. He is sued in his individual and official capacity.

14.     At all times pertinent to the allegations of this Complaint, the individuals named in Paragraphs 4-13 above (hereinafter the "Individual Defendants"), as well as Defendants Ochoa, Diaz, and Sheahan, acted under the color of the laws of the State of Illinois in connection with the allegations set forth in this Complaint.

15.     Defendant, Gabriel Ochoa, was at all times pertinent to the allegations of this Complaint a correctional officer with the CCDOC. He is sued in his individual and official capacity, and is named as a Defendant solely in Count IV of this Complaint.

16.     Defendant, Juan Diaz (also known as "Frank Diaz"), was the Chief Investigator of IAD from late 2002 until in or about March 2003, when he was relieved of that assignment. He is currently assigned as a correctional officer holding the rank of Sergeant with the CCDOC. He is sued in his individual and official capacity, and is named as a Defendant solely in Count II of this Complaint.

17.     Defendant, Michael Sheahan, is the Sheriff of Cook County and is ultimately responsible for the policies and decisions that injured the Plaintiffs. Defendant Sheahan, in collaboration with the individual corrections officers, maintained a policy or custom to conceal the wrongdoing of individual officers and mistreatment of inmates and to be deliberately indifferent to the harassment and retaliation leveled at the Plaintiffs. This policy or custom caused the deprivation of Plaintiffs' rights under the First and Fourteenth Amendments of the United States Constitution. Defendant Sheahan is sued in his official capacity.

18.     Defendant, Cook County, was at all times relevant to this Complaint the employer of Defendants Ochoa and Diaz and the Individual Defendants. CCDOC officers' W-2's state

quite clearly that their employer is "Cook County." They receive COBRA coverage from the Cook County Employee Benefits Office, which states that the benefits described therein are "[f]or Cook County Employees," and the Seal of Cook County is affixed to their benefits correspondence. They receive their deferred compensation information from the Board of Commissioners of Cook County, which refers to them as "County Employee[s]." Their paycheck is from Cook County. Their unemployment records unequivocally refer to the employer as "Cook County." By these actions and others, Cook County has cloaked its corrections officers with its own authority, and is properly liable as their employer.

19.     In addition, Defendant Cook County maintained a policy or custom to conceal the wrongdoing of individual officers and mistreatment of inmates, which resulted in the campaign of harassment and retaliation leveled at the Plaintiffs. The County exercises substantial control over the CCDOC and the Sheriff. For example, the county board recommends an annual budget to the sheriff, and it appropriates and provides funds for the operation of the Sheriff's department and the CCDOC. Further, while the powers and duties of the Sheriff are defined by state law, they are also defined, and may be altered by, county ordinance. Thus, the policies and customs that existed at the CCDOC, and the policy-making decisions of the Sheriff, are directly attributable to Cook County.

20.     In the alternative to ¶¶ 18-19, Defendant, Cook County, is empowered and directed to pay any tort judgment for compensatory damages (and any associated attorneys' fees and costs) for which the Sheriff or an employee acting within the scope of his employment is found liable. Accordingly, Cook County is also maintained as an indemnification party to Count V of this Complaint.

**Jurisdiction and Venue**

21.    This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(1), and 1367(a).  Venue is established under 28 U.S.C. § 1391(b) because the events giving rise to these claims occurred in Cook County, Illinois, and at least some of the Defendants reside in Cook County, Illinois.

**Factual Allegations**

**A.    Background.**

22.    The CCDOC's main facility ("Cook County Jail") is located at 2700 South California Avenue in Chicago, Illinois.  The CCDOC is organized into eleven separate Divisions, housing approximately 12,000 men and women.  Each Division is located in a separate facility. Division One is located in the oldest of the eleven facilities at CCDOC and houses approximately 1,200 male inmates.

23.    Special Incarceration Unit Two ("SI-2") is located in the basement of Division One.  It is one of two units that houses inmates that have been designated as "special incarceration" inmates because they are charged in high profile criminal cases, considered to be serious escape risks, involved in violence while in jail or are otherwise determined to require special incarceration treatment.  SI-2 houses many of the most serious offenders held at Cook County Jail, and therefore is among the most dangerous places for a correctional officer to work within the jail.

24.    Plaintiff Fairley graduated from the CCDOC Training Academy on January 27, 1995.  Upon graduation, he began working for the CCDOC as a correctional officer at the Cook County Jail.  He was initially assigned to the midnight shift in Division One.  In 1997, Plaintiff Fairley was assigned to the 7 a.m. to 3 p.m. shift in Division One.

25.     Plaintiff Gackowski graduated from the CCDOC Training Academy on August 25, 1995.  Upon graduation, he began working for the CCDOC as a correctional officer at the Cook County Jail.  He was initially assigned to Division Five under the supervision of Defendant Andrews and others.  In Fall 1997, he was assigned to the 3 p.m. to 11 p.m. shift in Division One.  In Fall 1998, he was assigned to the 7 a.m. to 3 p.m. shift in Division One, the same shift to which Plaintiff Fairley was assigned.

26.     During their separate training classes at the CCDOC Training Academy, Plaintiffs Fairley and Gackowski both were taught what was in essence a "Code of Silence."  The instructors at the Academy taught the cadets, including Plaintiffs Fairley and Gackowski, that they were to remain silent when asked about events at the Cook County jail by outsiders, including members of the press and the legal community.  They were told to reply to questions by giving statements such as "R/O [Reporting Officer] has no knowledge."  Plaintiffs were also instructed to follow CCDOC's General Order No. 1.13 which states, in part, that "[o]fficers . . . shall offer their observations or opinions which are work-related to the news media only with the consent of the Executive Director."

27.     In approximately early 1999, Plaintiffs Fairley and Gackowski met and became friends.  It became well known among their superiors and fellow officers in Division One that Plaintiffs Fairley and Gackowski were friends.

28.     By their words and actions, Plaintiffs made it clear to their superiors and fellow officers in Division One that they would not follow a "Code of Silence" if it meant compromising their professional and personal integrity.

29.     By their words and actions, Plaintiffs made it clear to their supervisors and fellow officers in Division One that they would not condone the beating and abuse of inmates and

subsequent cover-ups of such incidents. Plaintiffs voiced their objections to such incidents and made it known that they would not participate in such behavior. For example:

a) While witnessing Defendant Coffey beat up inmate Rodney Brown in April 2000 on Tier G1 in Division One, Plaintiff Gackowski yelled at Defendant Coffey to stop beating the inmate. He later told Defendant Coffey that his actions toward inmate Brown were uncalled for; and

b) During an altercation in Division One in mid 2000, Plaintiff Fairley witnessed Defendant Coffey run across the day room and "forearm" an inmate's head into a steel plate wall, and then continue to beat him. When Plaintiff Fairley expressed his disgust with Defendant Coffey's treatment of the inmate to him, Defendant Coffey accused him of being a snitch and threatened that he would beat him up.

**B.**   **Plaintiff Fairley Witnessed Correctional Officers Beating And Abusing Inmates On July 29, 2000 In SI-2; Plaintiff Gackowski Witnessed The Injuries Sustained By Inmate Scott As A Result Of The Beatings And Defendants Byrne And Fermaint Admit To The Beatings.**

30.    On July 29, 2000, Plaintiff Fairley observed Defendants Fermaint and Bercasio, along with Officers Griffin and Bonarek, violently beating inmates Nathson Fields, Luis Sanchez, Edward Mitchell and James Scott near SI-2 (the "SI-2 Incident").

31.    Plaintiff Fairley yelled at the officers to stop beating the inmates and warned the officers that they were going to kill the inmates if they did not stop.

32.    On July 29, 2000, Plaintiff Gackowski was present in the Division Eight Emergency Room when some of the individuals that were injured during the SI-2 Incident were brought in for treatment. Plaintiff Gackowski observed that inmate Scott was lying listlessly on a stretcher. He saw that inmate Scott's face was swollen and bleeding.

33.    Shortly after the SI-2 Incident, Plaintiff Fairley asked Defendant Byrne if he should write an Incident Report. Defendant Byrne told Plaintiff Fairley not to write a report because investigators from IAD would be taking statements from all of the individuals that were

involved in the incident. No representative from IAD ever took a statement from Plaintiff Fairley regarding the SI-2 Incident.

34. Sometime between July 29, 2000 and August 5, 2000, Plaintiff Fairley told Plaintiff Gackowski everything that he had observed during the SI-2 Incident.

35. In early August 2000, Defendant Byrne told Plaintiff Gackowski that he (Defendant Byrne) had twisted and jumped on inmate Mitchell's leg in an attempt to break it, but he could not get it to "snap." Defendant Fermaint also told Plaintiff Gackowski that he had beaten up inmate Scott.

36. On August 16, 2000, three of the four inmates that Plaintiff Fairley had observed being beaten filed a suit in the Law Division of the Circuit Court of Cook County, Illinois, entitled, *Fields, et al. v. Velasco, et al.*, No. 00L 0009339 (the "Fields Litigation"). Named as defendants in the lawsuit initially were Defendants Byrne and Fermaint, as well as Executive Director Ernesto Velasco, Superintendent James Edwards, Sergeant Suhail Siaj, Sergeant Gary Bennett, and Correctional Officers Carl Anderson, Michael Baker, Brian Bonarek, Humberto Enriquez, Daniel Griffin, Adrian Molina, Darnez Perkins, David Schmitt, Richard Turrise, and Ezequiel Velasquez. Defendant Bercasio, as well as Captain William Mollo and Correctional Officers Alfred Galvez and Wesley Jackson were later added as additional defendants in a second lawsuit regarding the SI-2 Incident.

37. After the lawsuit was filed, Plaintiffs Fairley and Gackowski made known to their fellow officers that they would tell the truth if asked about what they had seen or heard regarding the SI-2 Incident.

38.     Thereafter, the Defendants engaged in a series of deliberate actions to discourage Plaintiffs Fairley and Gackowski from attending depositions and from testifying or talking freely, fully and truthfully about the SI-2 Incident.

**C.     Defendants Attempted To Silence And Harass Plaintiff Fairley.**

39.     Following the filing of the lawsuit by the inmates injured in the SI-2 Incident, Defendants engaged in a campaign to silence and harass Plaintiff Fairley.

40.     After Plaintiff Fairley witnessed the SI-2 Incident on July 29, 2000, Defendant Byrne repeatedly assigned him to work in difficult, dangerous and stressful assignments including in SI-2. Defendant Byrne also repeatedly ignored Plaintiff Fairley's requests to be rotated out of SI-2. Defendant Byrne's actions, which in some instances violated departmental policy, were for the sole purpose of harassing and silencing Plaintiff Fairley.

41.     Defendant Andrews was responsible for overseeing the roster management rotation and took no action to ensure that Plaintiff Fairley's assignments were being rotated properly.

42.     Defendants Fermaint and Bercasio also harassed Plaintiff Fairley by, among other things:

    a)     Repeatedly refusing to allow Plaintiff Fairley to leave SI-2 in order to use the restroom;

    b)     Repeatedly refusing to provide Plaintiff Fairley with supplies requested by inmates, knowing that the inmates would become angered and subsequently take their anger out on Plaintiff Fairley;

    c)     Repeatedly swearing at Plaintiff Fairley and calling him "social worker" or "inmate lover"; and

    d)     Repeatedly grabbing Plaintiff Fairley from behind and imitating sexual acts upon him at roll call or during work hours.

43.     On February 25, 2002, the plaintiffs' lawyers in the Fields Litigation issued a subpoena to Plaintiff Fairley to appear for his deposition on April 18, 2002. The subpoena was sent to the Legal Office at CCDOC, but was never served on Plaintiff Fairley. On information and belief, Defendants Andrews and Byrne became aware of the Fairley deposition subpoena shortly after CCDOC's Legal Office received it.

44.     After learning of the subpoena, Defendant Byrne took further actions to harass and silence Plaintiff Fairley. In addition to continuing to repeatedly assign Plaintiff Fairley to SI-2, Defendant Byrne, among other things:

   a)     Improperly denied Plaintiff Fairley paternity leave after the birth of his youngest child; and

   b)     Improperly denied Plaintiff Fairley his requests to be paid for overtime already worked.

45.     On December 9, 2002, Chief Theisen sent Plaintiff Fairley a written memorandum informing Plaintiff Fairley that he would be deposed regarding the SI-2 Incident.

46.     On December 20, 2002, while Plaintiff Fairley worked in SI-2, inmate Keon Lipscomb, without provocation by Plaintiff Fairley, attacked Plaintiff Fairley with a shank, cutting him on the right wrist. After inmate Lipscomb was restrained on the floor, Plaintiff Fairley witnessed Defendant Byrne kick inmate Lipscomb in the mouth, knocking out one of his teeth.

47.     Before allowing Plaintiff Fairley to go to the Emergency Room for treatment, Defendants Byrne and Loizon ordered him to complete his paperwork regarding the incident. Attempting to prevent Plaintiff Fairley from truthfully reporting the incident, Defendant Byrne ordered Plaintiff Fairley not to report that there was a weapon involved in the attack or that Defendant Byrne had been involved in kicking inmate Lipscomb. Plaintiff Fairley's reports of

the incident disappeared twice, and the shank with which inmate Lipscomb cut Plaintiff Fairley was not recovered.

48.     On December 23, 2002, Defendant Kaufman assured Plaintiff Fairley that he would investigate and write a report of the stabbing incident by inmate Lipscomb and immediately forward the report to the Inspector General's Office.  The investigative file fails to show that any action was taken to investigate the incident or that any action was taken to discipline inmate Lipscomb.

49.     The failure by certain Individual Defendants to ensure that the incident was appropriately reported and investigated significantly added to Plaintiff Fairley's distress and fear for his safety.   By not punishing inmate Lipscomb, these Individual Defendants reinforced to Plaintiff Fairley that his fellow officers were not going to protect him and showed other inmates that they could attack Plaintiff Fairley without facing the usual consequences.

50.     It was known among Plaintiff Fairley's supervisors and fellow officers that his deposition was rescheduled for January 17, 2003.  As this date approached, the harassment and threats intensified in an attempt to silence Plaintiff Fairley.  From Fall 2002 until January 2003, Plaintiff Fairley was threatened on more than one occasion by certain Individual Defendants, including, but not limited to:

    a)     Defendant Coffey who warned Plaintiff Fairley that officers who tell on other officers "usually get met in the parking lot";

    b)     Defendant Bercasio who warned Plaintiff Fairley that he should not "fuck with people" because that is how you get stabbed;

    c)     Defendant Byrne who warned Plaintiff Fairley not to testify by telling him that inmate Lipscomb would *falsely* state that Plaintiff Fairley beat him (inmate Lipscomb); and

    d)     Defendant Prohaska who threatened the lives of Plaintiffs Fairley and Gackowski. (*See infra* at ¶ 60)

51.     In furtherance of the campaign of harassment, on January 6, 2003, Defendant Byrne, the Shift Commander, ignored Plaintiff Fairley's request for back-up help when a large group of inmates in the recreation room began acting in a manner that suggested a fight was imminent. Defendant Byrne told Plaintiff Fairley to let the inmates fight, a situation that would have placed Plaintiff Fairley in grave danger.

52.     After Plaintiff Fairley learned that Defendant Prohaska had made a threat against him and Plaintiff Gackowski (*see infra,* ¶ 60), Plaintiff Fairley concluded that it was no longer safe to work in Division One. Beginning January 11, 2003, Plaintiff Fairley used the remainder of his sick time and days off and did not report to work until he resigned.

**D.     Defendants Attempted To Silence And Harass Plaintiff Gackowski.**

53.     After the Fields Litigation was filed, Defendants engaged in a campaign to silence and harass Plaintiff Gackowski.

54.     In or around April 2001, it became known among his fellow officers that Plaintiff Gackowski had seen inmate Scott in the emergency room and would tell the truth about what he saw and heard regarding the SI-2 Incident.

55.     Beginning in April 2001, Defendants Fermaint and Bercasio began engaging in a wide-ranging campaign of harassment against Plaintiff Gackowski. The harassment included, but was not limited to:

a)      Repeatedly drawing, posting and circulating cartoons and pictures depicting Plaintiff Gackowski in a sexually humiliating manner;

b)      Repeatedly grabbing Plaintiff Gackowski from behind and imitating sexual acts upon him at roll call or during work hours;

c)      Repeatedly making derogatory sexual comments about Plaintiff Gackowski's wife; and

d)      Repeatedly swearing at Plaintiff Gackowski, calling him "social worker" or "inmate lover," and making derogatory sexual comments, such as "seal boy, come here and blow my horn."

56.      On June 14, 2002, Defendant Ochoa intercepted a telephone call from Plaintiff Gackowski's wife, Marissa Gackowski.  Although Defendant Ochoa knew that it was Mrs. Gackowski on the telephone, he addressed her as Officer Angel Stead, and asked her to hold while he went to get her boyfriend, Plaintiff Gackowski, in order to create the impression that Plaintiff Gackowski was committing adultery.  For several weeks thereafter, Defendant Ochoa repeatedly told other officers that Plaintiff Gackowski had been "having an affair" with Officer Stead.

57.      On June 18, 2002, Plaintiff Gackowski filed a written complaint with the IAD regarding the harassment he was experiencing.  On July 9, 2002, Plaintiff Gackowski filed another written complaint with IAD regarding the continual harassment by certain Individual Defendants.  Defendant Andrews berated Plaintiff Gackowski for filing these complaints and threatened to sue him for slander.  Defendant Weinstein, the Chief Investigator, was responsible for ensuring a prompt, effective investigation of these complaints.  On information and belief, neither of Plaintiff Gackowski's complaints was investigated until after January 10, 2003.

58.      As a result of filing the IAD complaints, Plaintiff Gackowski was transferred to work in Division Eight, where psychiatric inmates are held, in violation of departmental policies, including, but not limited to, policies requiring certain training in order to work in areas with psychiatric patient inmates and general departmental orders relating to harassment.

59.      From Fall 2002 until his resignation, Plaintiff Gackowski suffered further harassment and adverse employment actions including, but not limited to, harassing phone calls

14

from Defendants Fermaint and Bercasio and other officers, denial of overtime pay for work already completed, and double duty assignments given by Defendants Loizon and Byrne.

60. On January 7, 2003, Defendant Prohaska threatened Plaintiffs Gackowski and Fairley. Defendant Prohaska told Plaintiff Gackowski that they always knew Plaintiff Fairley was a weak link in the chain and that they were going to "bury the weak link." He then told Plaintiff Gackowski that he was "no better." Plaintiff Gackowski concluded that it was no longer safe to work in Division One.

61. On January 9, 2003, Plaintiff Gackowski provided two written Memoranda to Defendant Ernst detailing the harassment and threats that he had experienced since returning to Division One in November, 2002. In these memoranda, Plaintiff Gackowski wrote that he believed that it was no longer safe to work in Division One and was in fear for his and his family's safety.

62. On January 10, 2003, Plaintiff Gackowski met with Defendants Ernst and Diaz, Investigator Kenneth Raher, and Sgt. Ronald Zychowski for the purposes of pressing formal charges against Defendant Prohaska by signing a Cook County Sheriff's Police report and making a formal recorded statement regarding the threat made by Defendant Prohaska. At this meeting, Plaintiff Gackowski was prohibited from pressing formal charges or making a formal recorded statement.

**E.    Plaintiffs Resign As A Result of Defendants' Ongoing Campaign Of Harassment.**

63. As a result of the Defendants' harassment campaign in an attempt to silence Plaintiff Fairley, in Fall 2002, Plaintiff Fairley suffered from chest pains and was hospitalized and diagnosed with acute stress. Plaintiff Fairley's severe stress not only resulted in chest pains,

but also loss of sleep, loss of appetite, weight loss, exhaustion, and repeated headaches. His severe stress continues to the present.

64.     As a result of the Defendants' harassment campaign in an attempt to silence Plaintiff Gackowski, he has experienced severe stress resulting in sleep deprivation and repeated headaches. His severe stress continues to the present.

65.     On the morning of February 3, 2003, Plaintiffs Fairley and Gackowski, with their attorney, arrived at the IAD Office in Division Five and filed written emergency transfer requests. Plaintiffs spoke to Defendant Diaz, who accepted their transfer requests and assured them that he would deliver the requests to Acting Executive Director Maul immediately. Defendant Diaz also assured Plaintiffs that they would have a response from Acting Executive Director Maul no later than the close of business on February 3, 2003.

66.     Neither Acting Executive Director Maul, nor any other representative of the CCDOC, contacted the Plaintiffs on February 3 or 4, 2003 regarding their emergency transfer requests. Seeking a response regarding their emergency transfer requests, Plaintiffs Fairley and Gackowski went to Defendant Diaz's office in the late afternoon of February 4, 2003. They learned from Defendant Diaz that their emergency transfer requests had been diverted to the Legal Office at CCDOC and that they were not going to be granted. In fear of their safety and left with no other choice, Plaintiffs Fairley and Gackowski were compelled to submit their resignations.

**Legal Claims**

### Count I:  Deprivation of First Amendment Rights Under § 1983
**(Against Defendants Andrews, Byrne, Loizon, Fermaint, Bercasio, Coffey,
Prohaska, Ernst, Weinstein, and Kaufman (the Individual Defendants),
Defendant Sheahan, and Cook County)**

67.     Paragraphs one through sixty-six are hereby restated and re-alleged as paragraphs one through sixty-six of Count One.

68.     Plaintiffs Fairley and Gackowski repeatedly spoke out and attempted to speak out on matters of public concern, namely, they made it known that they would not conceal the mistreatment of inmates, they indicated that they would testify truthfully in court regarding the mistreatment of inmates, and they attempted to report the wrongdoing and acts of concealment of other officers.  Plaintiffs had a right to speak out on matters of public concern, testify truthfully, and report the wrongdoing of others pursuant to the First and Fourteenth Amendments of the United States Constitution.  The Plaintiffs' right to speak out on matters of public concern outweighed any right of the CCDOC or the County to maintain secrecy regarding these matters.

69.     The Individual Defendants, acting under color of state law and without legitimate justification, intentionally engaged in a campaign of harassment and retaliation deliberately aimed at silencing the Plaintiffs and thwarting their attempts to report and testify on matters of the State's interest and of public concern.

70.     Cook County, through the Individual Defendants in their official capacities, was the moving force behind this campaign of harassment and retaliation.   To that end, the harassment and retaliation aimed at the Plaintiffs and the concealment of the wrongdoing of individual officers and mistreatment of inmates resulted either from an express municipal policy or widespread custom at the CCDOC, or the policy-making decisions of Sheriff Sheahan, who has final policy-making authority with respect to the CCDOC and Cook County.  (See ¶ 19).

The Individual Defendants acted pursuant to these policies or customs in harassing and retaliating against the Plaintiffs.

71.     Through this campaign of harassment and retaliation, Plaintiffs were chilled from speaking out on matters of public concern in violation of their First and Fourteenth Amendment rights, and were threatened to the point of their constructive discharge.

WHEREFORE, Plaintiffs request the following relief:

a)     Judgment for compensatory damages, including but not limited to lost earnings, loss of future earning capacity, and medical expenses, and other damages to compensate Plaintiffs for the deprivation of their rights, jointly and severally against the Defendants;

b)     Judgment for punitive or exemplary damages, jointly and severally against the Individual Defendants, in their individual capacities;

c)     Under 42 U.S.C. § 1988, an award of the costs of this action, including reasonable attorney fees, jointly and severally against the Defendants; and

d)     Such other and further relief that to this Court may seem just and equitable.

### Count II: Civil Conspiracy For Deprivation of First Amendment Rights
**(Against Defendants Andrews, Byrne, Loizon, Fermaint, Bercasio, Coffey, Prohaska, Ernst, Weinstein, and Kaufman (the Individual Defendants), Defendant Diaz, Defendant Sheahan, and Cook County)**

72.     Paragraphs one through seventy-one are hereby restated and re-alleged as paragraphs one through seventy-one of Count Two.

73.     The Defendants entered into an express or implied agreement to participate in an unlawful act, namely the deprivation of Plaintiffs' First and Fourteenth Amendment rights under color of state law in violation of §1983.

74.     The Plaintiffs were injured in their person and property due to several overt acts committed by the Defendants to deprive the Plaintiffs of their First and Fourteenth Amendment rights.

75.     The Defendants' acts to deprive the Plaintiffs of their First and Fourteenth Amendment rights were deliberately committed in furtherance of a common scheme to harass and silence the Plaintiffs and to deprive them of their First and Fourteenth Amendment rights.

76.     The conspiracy between the Defendants was part of a broader policy or custom at the CCDOC and Cook County (See ¶ 70), and permeated the ranks of the CCDOC's employees.

WHEREFORE, Plaintiffs request the following relief:

a)     Judgment for compensatory damages, including but not limited to lost earnings, loss of future earning capacity, and medical expenses, and other damages to compensate Plaintiffs for the deprivation of their rights, jointly and severally against the Defendants;

b)     Judgment for punitive or exemplary damages, jointly and severally against the Individual Defendants and Defendant Diaz, in their individual capacities;

c)     Under 42 U.S.C. § 1988, an award of the costs of this action, including reasonable attorney fees, jointly and severally against the Defendants; and

d)     Such other and further relief that to this Court may seem just and equitable.

### Count III: Conspiracy to Obstruct Justice Under § 1985(2)
**(Against Defendants Andrews, Byrne, Loizon, Fermaint, Bercasio, Coffey, Prohaska, Ernst, Weinstein, and Kaufman (the Individual Defendants), Defendant Sheahan, and Cook County)**

77.     Paragraphs one through seventy-six are hereby restated and re-alleged as paragraphs one through seventy-six of Count Three.

78.     The Defendants conspired to obstruct the due course of justice in the Fields Litigation by attempting to prevent Plaintiffs from testifying truthfully.

79.     The Defendants performed several overt acts to harass and silence the Plaintiffs and to obstruct the due course of justice in furtherance of this conspiracy.

19

80. The actions of the Defendants were motivated by a class-based animus towards the Plaintiffs. The Plaintiffs were treated differently than other officers regarding their right to report wrongdoing within the department, and in their access to investigative and reporting procedures in the department. Further, the Plaintiffs constituted a discrete group that was repeatedly mistreated on the basis of sex. The Plaintiffs were singled out and intentionally treated differently than other officers, and there was no rational basis for this mistreatment.

81. The conspiracy between the Defendants was part of a broader policy or custom at the CCDOC and Cook County (See ¶ 70), and permeated the ranks of the CCDOC's employees.

82. As a direct and proximate result of the conduct of the Defendants, Plaintiffs were intentionally denied the equal protection of the law and were injured as a result of this deprivation of their rights.

WHEREFORE, Plaintiffs request the following relief:

a) Judgment for compensatory damages, including but not limited to lost earnings, loss of future earning capacity, and medical expenses, and other damages to compensate Plaintiffs for the deprivation of their rights, jointly and severally against the Defendants;

b) Judgment for punitive or exemplary damages, jointly and severally against the Individual Defendants, in their individual capacities;

c) Under 42 U.S.C. § 1988, an award of the costs of this action, including reasonable attorney fees, jointly and severally against the Defendants; and

d) Such other and further relief that to this Court may seem just and equitable.

### Count IV: Intentional Infliction of Emotional Distress
**(Against Defendants Andrews, Byrne, Loizon, Fermaint, Bercasio, Coffey, Prohaska, Ernst, Weinstein, and Kaufman (the Individual Defendants), Defendant Ochoa, and Cook County)**

83.     Paragraphs one through eighty-two are hereby restated and re-alleged as paragraphs one through eighty-two of Count Four.

84.     Through their pattern of harassment and retaliation, the Individual Defendants engaged in conduct that was extreme and outrageous.

85.     This extreme and outrageous conduct was intended to inflict severe emotional distress upon the Plaintiffs, or the Individual Defendants and Defendant Ochoa at least knew that there was a high probability that their conduct would cause severe emotional distress.

86.     As a result of this extreme and outrageous conduct, the Plaintiffs suffered severe emotional distress, and continue to suffer severe emotional distress to this day.

87.     Defendant Cook County is liable for the wanton and willful acts of the Individual Defendants and Defendant Ochoa, which were committed in the scope of their employment with Cook County (See ¶ 18), and in furtherance of Cook County's business and its policy to harass and retaliate against the Plaintiffs.

WHEREFORE, Plaintiffs request the following relief:

    a)     Judgment for compensatory damages, jointly and severally against the Defendants; and

    b)     Such other and further relief that to this Court may seem just and equitable.

### Count V: Indemnification
**(Against Cook County)**

88.     Paragraphs one through eighty-seven are hereby restated and re-alleged as paragraphs one through eighty-seven of Count Five.

89.     Pursuant to 745 ILCS 10/9-102 and 55 ILCS 5/4-6003 and 55 ILCS 5/5-1106, Defendant Cook County is empowered and directed to pay any tort judgment for compensatory damages (and any associated attorneys fees and costs) for which an independently elected Cook County officer such as Defendant Sheahan or his deputies acting within the scope of their employment is found liable.

90.     Defendant Cook County is liable for any judgment entered against the Individual Defendants and Defendants Ochoa, Diaz, and Sheahan for compensatory damages and for the associated attorneys fees and costs. The acts of the Defendants in Counts I-IV were committed within the scope of their employment.

91.     In the event a judgment for compensatory damages is entered against the Defendants listed in ¶ 90, Defendant Cook County must pay the judgment, as well as the associated attorneys fees and costs.

WHEREFORE, Plaintiffs request the following relief:

a)      Judgment pursuant to 745 ILCS 10/9-102 and 55 ILCS 5/4-6003 and 55 ILCS 5/5-1106 against Defendant Cook County; and

b)      Such other and further relief that to this Court may seem just and equitable.

### Jury Trial Demanded

92.     Paragraphs one through ninety-one are hereby restated and re-alleged as paragraphs one through ninety-one of Plaintiffs' Demand for a Jury Trial.

93.     Plaintiffs demand a trial by jury.

Date:  September 30, 2003

Respectfully submitted,

ROGER FAIRLEY AND
RICHARD GACKOWSKI

By: _____
    One of Their Attorneys

Steven F. Molo
Bradley C. Graveline
Cardelle Bratton
Richard A. Duda
Andrew Malahowski
Christiana M. Coop
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
312-558-5600
312-558-5700 fax

Bob Hodge
Law Offices
36 S. Wabash Ave. Room 1310
Chicago, IL 60603
312-422-1707
312-422-0708 fax

CHI:1267944.2

23

## CERTIFICATE OF SERVICE

I, Bradley C. Graveline, one of the attorneys for Plaintiffs, do hereby certify that I caused a true and accurate copy of the foregoing First Amended Complaint to be served by messenger on September 30, 2003 upon the counsel listed below:

Michael J. Hayes
Gardner, Carton & Douglas, LLC
191 North Wacker Drive
Chicago, IL 60606

E. Michael Kelly
Hinshaw & Culbertson
222 North LaSalle Street, Suite 300
Chicago, IL 60601

Daniel P. Duffy
Duffy & Mundo, P.C.
208 West Washington Street, Suite 512
Chicago, IL 60606

Jeffrey S. McCutchan
Assistant State's Attorney
Special Projects and Assignments
District 1 Office of the
 Cook County State's Attorney's Office
500 Richard J. Daley Center
Chicago, IL 60602

Bradley C. Graveline