| | | |
|---|---|---|
| ROGER FAIRLEY and RICHARD GACKOWSKI, | ) ) ) | No. 03 C 5207 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Judge Ruben Castillo |
| SUPT. DENNIS ANDREWS, *et al.*, | ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This hotly-contested lawsuit—in which two former guards at the Cook County jail have alleged a conspiracy by Defendants[1] to cover up inmate abuse—has been pending before this Court for over two and a half years. It is the oldest lawsuit presently pending on this Court's docket. During the course of this litigation, this Court has resolved 146 contested motions,[2] mainly concerning discovery disputes between the parties. That number does not include either the instant motions for recusal or the twelve motions for summary judgment which this Court was actively considering at the time Defendants filed the instant motions.

---

[1]This Court uses the term "Defendants" to refer to the twelve named defendants, collectively.

[2](R. 4, 9, 10, 13, 20, 21, 22, 23, 57, 60, 61, 66, 69, 71, 72, 73, 74, 77, 83, 87, 88, 89, 93, 99, 103, 104, 107, 108, 109, 112, 115, 121, 123, 129, 130, 131, 134, 137, 138, 141, 142, 148, 149, 150, 151, 152, 155, 156, 158, 161, 162, 163, 166, 169, 171, 176, 177, 179, 183, 193, 195, 196, 198, 201, 203, 207, 211, 215, 217, 219, 221, 228, 230, 234, 238, 241, 244, 246, 249, 252, 254, 255, 260, 263, 265, 267, 270, 275, 277, 279, 293, 296, 302, 304, 306, 308, 310, 313, 317, 315, 319, 321, 323, 326, 329, 331, 333, 337, 338, 339, 340, 344, 346, 348, 353, 357, 360, 365, 367, 369, 372, 374, 375, 385, 393, 394, 396, 406, 408, 411, 417, 419, 413, 425, 473, 478, 480, 484, 486, 488, 492, 510, 522, 558, 590, 592.)

On February 17, 2006—only two months before trial was scheduled to begin in this case—defendants Sheriff Michael Sheahan, Edward Byrne, Juan Diaz, Gregory Ernst, Tim Kaufman, and Saul Weinstein filed their joint motion to recuse Judge Ruben Castillo. (R. 626.) The remaining defendants—Dennis Andrews, Patrick Loizon, Evan Fermaint, Norberto Bercasio, Fred Coffey, and Ronald Prohaska, with the exception of defendant Cook County—also filed a recusal motion in which they adopted all of the arguments contained in the initial motion to recuse. (R. 630.) At the first hearing on this motion, Defendants' attorney admitted that this motion was "client driven" but conceded that none of the defendants had ever attended any of the numerous court hearings held in this litigation. (3/1/06 Tr. at 4-5, 9.)

In support of their motions, Defendants submitted substantially similar affidavits purporting to attest to this Court's bias. This Court's initial review of those affidavits revealed that several of the assertions therein stretched the boundaries of good faith. Therefore, at the initial hearing on this matter, this Court gave Defendants the opportunity to amend their statements to withdraw any inappropriate, baseless allegations. Defendants availed themselves of this opportunity, and as a result, currently under this Court's consideration are Defendants' Amended Joint Motion to Recuse Judge Ruben Castillo and accompanying affidavits.[3] (R. 645-7, Ex. G.)

In what can only be described as a kitchen-sink approach to this matter, Defendants' amended motion and accompanying affidavits contain a broad slew of allegations which purport

---

[3]Defendants withdrew their inappropriate personal attacks on this Judge without explanation in their amended motion and substitute affidavits and without any apology to this Court. (R. 645.)

2

to demonstrate this Court's bias against them.[4]  In light of the extremely contentious and protracted proceedings in this case, this Court considers this to be a very serious motion which warrants close scrutiny.[5]  This Court has carefully considered each of Defendants' arguments and allegations and will address them all below.

## LEGAL STANDARDS

Defendants ask this Court to recuse itself under 28 U.S.C. §§ 144 and 455, which present two separate standards for recusal.  Under section 144, "[w]henever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein. . . . The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists[.]"  28 U.S.C. § 144.  In reviewing these affidavits, "a court may only credit facts that are sufficiently definite and particular to convince a reasonable person that bias exists; simple conclusions, opinions, or rumors are insufficient . . . Moreover, because the statute is heavily weighed in favor of recusal, its requirements are to be strictly construed to prevent abuse."  *Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 718 (7th Cir.

---

[4]Besides variations in the use of certain articles and pronouns, Andrews, Loizon, Fermaint, Bercasio, Coffey, and Prohaska filed affidavits that are identical except for language in paragraphs 1 and 3 that is immaterial for purposes of resolving this motion.  Likewise, Byrne, Diaz, Ernst, Kaufman, and Weinstein filed identical affidavits except for Paragraph 3, which states their individual occupations.  The latter defendants again adopted the arguments contained in the former defendants' amended motion for recusal.  (R. 647-2.)  Defendants have adopted by reference the exhibits they filed with their initial recusal motions.  (R. 649, Defs.' Mot. for Leave to Withdraw ¶ 15.)

[5]For a specific description of the allegations at issue in this case, please see this Court's previous opinion partially granting and partially denying Defendants' motion to dismiss, located at *Fairley v. Andrews*, 300 F. Supp. 2d 660 (N.D. Ill. 2004).

3

2004) (citations omitted). Recusal is only warranted under section 144 when the movant has made a showing that the presiding judge has an actual bias against the movant or the movant's case. *Id.* "[O]nly personal animus or malice on the part of the judge can establish bias." *Id.*

Section 455 covers a much wider territory than section 144 because section 455(a) does not require a showing of actual interest or bias to warrant judicial recusal.[6] Under section 455(a), a judge must recuse himself "in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). This is an objective standard that asks if a reasonable observer would perceive "a significant risk that the judge will resolve the case on a basis other than the merits." *Hook v. McDade*, 89 F.3d 350, 354 (7th Cir. 1996). Section 455(a) only applies if a judge's impartiality would be questioned by a "well-informed, thoughtful observer rather than . . . a hypersensitive or unduly suspicious observer." *Hook*, 89 F.3d at 354 (quoting *Matter of Mason*, 916 F.2d 384, 385-86 (7th Cir. 1990)).

Both recusal statutes require bias to "stem from an extrajudicial source." *Liteky v. United States*, 510 U.S. 540, 544, 554 (1994). The Supreme Court, however, has held that the extrajudicial source doctrine is not absolute, and in some rare cases recusal is warranted where a judge's "favorable or unfavorable predisposition . . . even though it springs from the facts adduced or events occurring at trial . . . is so extreme as to display the clear inability to render fair judgment." *Liteky*, 510 U.S. at 551. Consequently, this Court will address each of Defendants' arguments for recusal, even though the vast majority of their arguments are based on judicial sources.

---

[6] The analysis under section 455(b) is identical to section 144, and thus no separate discussion of section 455(b) is required. *Brokaw v. Mercer County*, 235 F.3d 1000, 1025 (7th Cir. 2000).

4

## ANALYSIS

### I.    No Actual Bias Exists Under 28 U.S.C. § 144

This Court has no conceivable actual bias in this case. Pursuant to section 144, Defendants have submitted affidavits purporting to demonstrate this Court's actual bias against them personally and against their case generally. These affidavits contain self-serving, broad allegations of this Court's partiality.[7] Defendants' argue that this Court is biased because it: (1) has entered numerous adverse rulings against Defendants; (2) has allegedly threatened to communicate with potential jurors regarding defense counsel's conduct in this case; (3) has made comments in the course of settlement discussions and on the record indicating the Court's disapproval of defense counsel's refusal to settle in light of the perceived merits of Plaintiffs' case; and (4) has a teaching post at Northwestern University Law School. Despite the far-fetched nature of some of the assertions put forth in Defendants' motion and accompanying affidavits, this Court will fully address each of the arguments below to ensure that there is no lingering doubt regarding this Court's lack of actual interest or bias in this case.

---

[7]Several of Defendants' assertions in their initial affidavits stretched the boundaries of good faith—for example, the suggestion that this Judge harbors "utter disdain for . . . law enforcement in general." (*See, e.g.*, R. 626, Defs.' Mot., Ex. A, Sheahan Aff. ¶ 5.) This allegation was withdrawn when Defendants accepted this Court's invitation to withdraw inappropriate personal attacks contained in their initial motion. This Court expressly rejects Defendants' repeated attempts to make this lawsuit a "law enforcement" case. This case is a lawsuit by two former correctional officers against officials who may be responsible for the alleged "coverup" of prisoner abuse at the Cook County jail. Additionally, this Court's law enforcement credentials as well as this Court's public criticism of law enforcement misconduct is well-established. *See Martinez v. Vill. of Mt. Prospect*, 92 F. Supp. 2d 780 (N.D. Ill. 2000) (Castillo, J.) (criticizing the practice of police racial profiling).

## A.    Judicial Rulings

At the hearing on the initial recusal motion, Defendant Sheahan's counsel made clear that at the heart of this motion lie "rulings that the Court has made to motions, some of the procedures that were put in place through the discovery process." (3/1/06 Tr. at 4.)  The Supreme Court has held, however, that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555.  In the absence of evidence of extrajudical bias, adverse rulings "can only in the rarest circumstances evidence the degree of favoritism or antagonism required[.]" *Id.*  The Seventh Circuit has acknowledged that rather than demonstrating judicial bias, numerous rulings in favor of one party "may show nothing more than that [party] had the better case or the abler lawyer." *Hoffman*, 368 F.3d at 719 (citations omitted).

Despite this clear precedent, the main thrust of Defendants' motion is based on a selected portion of the numerous pretrial rulings this Court has issued.  Nevertheless, the Court will address each of the rulings called into question by Defendants.  With one exception, each of these rulings represents this Court's exercise of discretion in the course of routine discovery issues. *See, e.g.*, *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 813 (7th Cir. 2006) (noting that "[i]t is well-settled that district courts enjoy broad discretion in controlling discovery.")  The vast majority of these rulings occurred during brief appearances at this Court's morning motion and status hearings, which are time-constrained due to this Court's need to give attention to its other criminal and civil cases.  In some instances jurors, parties, and attorneys were waiting for the conclusion of these contested proceedings to continue with trials being conducted by this Court.  As demonstrated below, this Court stands by the merits of its rulings and finds that none of them

6

represent "the degree of favoritism or antagonism required" to demonstrate that this Court is biased.

### 1. August 18-19, 2004

On August 18 and 19, 2004, this Court granted Plaintiffs' motion to take thirty-three depositions and to serve discovery regarding their *Monell* policy claims. (R. 70, 75, 76.) Defendants argue that this ruling demonstrates "unmistakable bias" because this Court granted the motion before the date it was set for a hearing and without giving Defendants an opportunity to respond. (R. 645, Ex. G, Defs.' Am. Jt. Mot. at 7.) However, given the number of defendants, witnesses, and incidents at issue in this case—including the need for Plaintiffs to show evidence of other incidents to support a *Monell* policy claim—this Court's decision to allow Plaintiffs to take more than the standard ten depositions is unremarkable. In fact, it would have been unreasonable for this Court to refuse to allow Plaintiffs to exceed the standard deposition limit in a case of this scope and magnitude. This ruling on a reasonable discovery request was a basic matter of case management, and as such, constituted a valid exercise of the Court's discretion to maintain efficiency in the discovery process. *See Mosher v. Dollar Tree Stores, Inc.*, 240 F.3d 662, 664 n.1 (7th Cir. 2001) (noting that judges may use certain case management tactics to help organize their trial schedules, promote settlement, and better serve the needs of the litigants that come before them, especially in "litigious districts such as the one in Chicago, [where] federal judges carry an unwieldy burden."); *Cowen v. Bank United of Tex., FSB*, 70 F.3d 937, 944 (7th Cir. 1995) (noting that "controlling the pace and scope of discovery, being a matter of case management rather than the application of hard and fast rules, is . . . within the district judge's discretion.").

7

### 2. September 1, 2004

On September 1, 2004, this Court stated on the record that "when I receive a request, a discovery request, I'm going to give the defense 48 hours to file whatever you want to file with me telling me why I shouldn't grant it, and I will not rule within that 48 hours." (R. 626, Ex. M, 9/1/04 Tr. at 6.) Defendants argue that this ruling demonstrates this Court's bias because it "effectively gave expedited treatment to Plaintiffs' motions" and "shifted the burden to Defendants to bring a motion to reconsider." (R. 645, Ex. G, Defs.' Am. Jt. Mot. at 708.) This procedure, however, applied equally to Plaintiffs, obligating them to respond to Defendants' discovery requests within the same forty-eight hour time frame. This procedure gave both parties an opportunity to respond to discovery requests as long as they acted expeditiously, in accordance with the Court's attempt to evenhandedly deal with the emergence of a great deal of discovery disputes in this lawsuit. In fact, Plaintiffs' counsel noted that the Court's discovery schedule was causing them hardship, stating that "it is the tightest squeeze I've ever experienced." (R. 626, Ex. M, 9/1/04 Tr. at 5.) Moreover, the Court adopted this procedure after admonishing Plaintiffs' counsel not to expect that the Court would continue to grant their requests for additional depositions, and expressing its desire to keep discovery on a tight schedule. (*Id.*) Discovery rulings are a matter of the Court's discretion, and the Court need not allow briefing on discovery motions. *See Weeks v. Samsung Heavy Indus. Co.*, 126 F.2d 926, 943 (7th Cir. 1997) (stating that "[d]istrict courts enjoy extremely broad discretion in controlling discovery.").

### 3. October 6, 2004

Next, Defendants suggest that the Court's denial of their motion to stay *Monell* discovery

8

reflects this Court's bias against them. This Court, however, properly applied its discretion in denying this motion to stay discovery. (*See* R. 626, Ex. O, 10/6/04 Tr. at 7.) Where the court finds that a motion to stay discovery is unlikely to significantly expedite the litigation, and may actually slow it down, the court will—and in this case did—decline to stay discovery. *See Builders Ass'n of Greater Chi. v. City of Chi.*, 170 F.R.D. 435, 437 (N.D. Ill. 1996).

Additionally, Defendants' affidavits cite this Court's refusal to strike a status report that Plaintiffs filed without request from this Court. (*See* R. 645, Ex. A, Sheahan Aff. at 4.) This Court called the motion to strike ridiculous, and it stands by that statement. Instead of filing yet another contentious pretrial motion, Defendants could have filed their own report or filed a response if they disagreed with anything contained in Plaintiffs' report.

### 4.    November 23, 2004

Defendants also argue that this Court's order requiring Defendants to review and produce ninety-one boxes of documents within one week, over the Thanksgiving holiday, demonstrates this Court's anti-Defendant bias. (R. 645, Ex. G, Defs.' Am. Jt. Mot. at 9.) Defendants' argument ignores the context in which this Court made this ruling. Plaintiffs had requested these documents in August 2004, and production of these documents was already months overdue on the date the Court entered this ruling. These documents had been the subject of six motions to compel, the first of which the Court granted on October 26, 2004. (*See* R. 118.) Given their repeated delay in producing the documents, Defendants' characterization of the November 23, 2004 order is patently misleading. The Court did not consider the upcoming holiday in making its appropriate one-week ruling and regrets that Defendants' attorneys remain upset about working that weekend.

9

### 5.    March 29, 2005

Defendants' affidavits next accuse this Court of bias for allowing Plaintiffs leave to

depose three witnesses and to subpoena depositions from other litigation against Sheahan after

earlier denying this request.[8]  (R. 645, Ex. A, Sheahan Aff. at 6.)  This Court, however,

appropriately determined that Plaintiffs had shown that such testimony and documents may be

relevant to the proceedings in this case, including the *Monell* claim.  Defendants argue that these

rulings demonstrate this Court's bias because on the same day, this Court denied Defendants'

request to subpoena one of the Plaintiffs' military records.  This Court is not obligated to grant

one party's unreasonable subpoena request simply because it has granted another party's

reasonable subpoena request on the same day.  Defendants' displeasure with these rulings is an

insufficient basis to support their accusation of bias.  *See Liteky*, 510 U.S. at 555.

### 6.    April 19, 2005

On April 19, 2005—after Plaintiffs had already completed thirty-seven depositions—this

Court granted Plaintiffs' motion for leave to take ten additional depositions and stated that

Plaintiffs would be permitted no more than sixty depositions in this case.  At the hearing,

Defendants requested a cap of forty-five depositions.  (R. 626, Ex. Q, 4/19/05 Tr. at 4-5.)

Defendants now argue that because the allotted sixty depositions is more than this Court had ever

allowed in another case, this ruling demonstrates its anti-Defendant bias.  (R. 645, Ex. G, Defs.'

Am. Jt. Mot. at 9.)  In capping the number of depositions at sixty, this Court noted that

Defendants identified 114 persons with knowledge in this case, and that even if the Court granted

---

[8]Defendants fail to attach the transcript to these proceedings, so the context and reasons
behind this ruling are not available.

just five depositions per Defendant, that would result in a total of seventy depositions. (*Id.* at 4-5, 9.) The Court compromised and capped Plaintiffs' depositions at a number roughly between the cap proposed by Defendants and the number that would represent five depositions per Defendant. While this Court entered the cap reluctantly, stating that it "fear[ed] that 60 is still too high," this Court, in the exercise of its discretion, determined that the interests of justice and judicial economy required that Plaintiffs be permitted to take these additional depositions. (*Id.* at 9.)

### 7.     May 24, 2005

Defendants' affidavits next cite this Court's order granting sanctions against certain of Defendants' counsel after they cancelled two depositions the day before they were scheduled to take place even though they informed the Court that Plaintiffs' counsel had cancelled depositions the same day they were scheduled to proceed.[9] (*See* R. 645, Ex. A, Am. Sheahan Aff. at 6.) Defendants' affidavits do not assert, however, that they sought and were denied sanctions against Plaintiffs' counsel for those cancellations. (*Id.*) Defendants further do not assert that their actions were defensible or that sanctions were unwarranted. The fact remains that the official docket of this contested lawsuit shows that Defendants repeatedly refused to comply with their discovery obligations in this lawsuit and engaged in a pattern of discovery delay. Accordingly, there is no basis on which to conclude that the cited sanctions order was the result of anti-Defendant judicial bias.

---

[9]Defendants have not provided the transcript of this proceeding and so the full context and reasoning for this ruling is missing.

11

### 8.    June 17-28, 2005

On June 17, 2005, Defendants filed a motion requesting leave to serve the following interrogatory:

> Identify and describe in detail the knowledge possessed by each and every person whom you have identified, as persons with knowledge of the allegations in the First Amended Complaint, in your responses and supplemental responses to Defendant Sheriff Sheahan's First Set of Interrogatories.

(R. 246, Ex. A.)  Though the motion was noticed for a hearing on June 22, 2005, the Court granted the motion at the end of a hearing held on June 21, even though the Court and Plaintiffs' counsel had not yet reviewed it, after Defendants' counsel represented that he had a motion pending to serve "one additional interrogatory." (R. 626, Ex. R, 6/21/05 Tr. at 5.) The Court did so without discussion as a courtesy to Defendants' counsel to "avoid you having to come back tomorrow." (*Id.*) In extending this courtesy to Defendants' counsel, this Court mistakenly trusted that this lawyer would not deliberately misinform or mislead this Court as to the nature of the interrogatory. Plaintiffs' counsel, demonstrating civility and courteousness, indicated that even though she had not seen it, she would not object to one additional interrogatory. (*Id.*)

The Court's actual review of the proposed interrogatory, however, revealed its inappropriate and sweeping nature so close to the end of discovery. Therefore, this Court felt compelled to change its earlier ruling, and later that same day, this Court entered the following order:

> Please note the rest of this order is different from that stated in open court when the court had not evaluated defendants' motion.  Upon careful review of Defendants' motion for leave to serve additional discovery requests, the Court believes that this request is unduly burdensome to the plaintiffs and therefore denies the motion.

(R. 626, Ex. S, 6/21/05 Order.)

Defendants argue that the Court's change of ruling demonstrates its bias because the Court had previously allowed Plaintiffs to serve a substantially similar interrogatory on Defendants. (R. 645, Ex. G, Defs.' Am. Jt. Mot. at 12.) Defendants fail to mention, however, that they introduced this interrogatory just over one month before the close of two years of discovery, and almost a year and a half after Plaintiffs were given leave to serve a similar interrogatory. The Court stands by its June 21, 2005 decision to deny Defendants leave to serve this interrogatory—the equivalent of numerous discovery requests framed as one interrogatory—on the eve of the discovery deadline, because it would be unduly burdensome to Plaintiffs.

Defendants also argue that this Court's statements at the June 28, 2005 hearing to reconsider this ruling demonstrate its bias because this Court chided Defendants' counsel for mischaracterizing the motion as asking for leave to file "one additional interrogatory." (*Id.*) It was evident to this Court that counsel was trying to "sneak in" the interrogatory by neglecting to explain that it would have required Plaintiffs to identify in detail the knowledge of more than eighty witnesses on the eve of the close of two years of discovery. It is ironic that Defendants attempt to use their own attorney's lack of candor to seek this Court's recusal. It is this same lack of candor which has led to many of the discovery problems in this lawsuit. This Court stands by its rulings and accompanying statements.

### 9.    June 21, 2005

Defendants' affidavits complain that this Court allowed Plaintiffs to amend their complaint "to add new allegations" without allowing Defendants to re-depose Plaintiffs. (R. 645, Ex. A, Sheahan Aff. at 6.) The amendment was specifically granted to allow Plaintiffs to

13

conform their complaint to this Court's order dismissing a count from the complaint. Plaintiffs represented that none of the allegations in the complaint contained evidence that Defendants were not aware of. (R. 244, Pls.' Mot. to File Am. Compl. ¶ 3.) Furthermore, on the date of the ruling, Defendants had already conducted extensive depositions of Plaintiffs. Given this context, this Court's ruling was reasonable, and Defendants' attempt to spin it to demonstrate bias is unsupportable.

### 10. July 13, 2005

On July 11, 2005—three weeks after the Court denied Defendants' request to file their essentially eighty-part interrogatory (asking Plaintiffs to identify the knowledge of more than eighty witnesses)—Defendants filed a motion to depose ten of thirteen additional individuals whom Plaintiffs named as individuals with knowledge of the complaint on June 17, 2005, in their third supplemental answers to Sheahan's interrogatories. (R. 275.) Defendants' motion stated that "Defendants do not know the knowledge held by each of these individuals identified by Plaintiff." (*Id.* ¶ 7.) In the hearing on this motion, defense counsel acknowledged that he actually knew who two of the individuals were—both employees of the Sheriff—and represented that Defendants desired "to learn who these people are and what their knowledge may be so that we could obviate the need for deposing them." (R. 626, Ex. U, 7/13/05 Tr. at 24.) This Court expressed skepticism regarding counsel's representation that he did not know of the remaining individuals, stating that "in today's world, Internet access and being able to conduct any type of research, I just cannot accept counsel's representation that you don't know anything about these individuals[.]" (*Id.* at 25.) Defendants argue that the Court's ruling and surrounding statements demonstrate this Court's bias against them.

14

This argument has no merit. First, the Court denied this motion *without prejudice*, giving Defendants leave to re-file the motion to assert valid reasons the depositions were needed. Second, the proposed deponents consisted of "either current or former employees of the sheriff's office and/or law students and staff from the University of Chicago Law School who were involved at some stage in the *Fields* litigation and . . . a former attorney for Mr. Gackowski's[.]" (*Id.*, Ex. U, 7/13/05 Tr. at 23.) Bias played no part in this Court's decision, and this Court maintains its incredulity at defense counsel's assertion that he had no idea who these proposed deponents were.

### 11.    August 10, 2005

Defendants' affidavits assert that this Court's ruling granting Plaintiffs leave to serve 145 requests to admit upon Defendants necessarily indicates bias because the Court denied Defendants leave to propound their additional eighty-part interrogatory. This claim is meritless because it is comparing apples to oranges. If Defendants had similarly propounded an extensive but structured request to admit upon Plaintiffs, the Court would have allowed this discovery. Instead, Defendants repeatedly filed unfocused, ill-timed, broad discovery requests that delayed and increased the cost of this lawsuit.

### 12.    September 7, 2005

Next, Defendants argue that this Court's rulings granting Plaintiffs' motion to preclude the trial testimony of six defense witnesses and denying Defendants' motion to bar the trial testimony of one of Plaintiffs' witnesses reveals this Court's anti-Defendant bias. These rulings simply do not display bias. The six defense witnesses barred by this Court were not revealed by Defendants until August 29, 2005, and August 31, 2005, in their supplemental answers to

15

interrogatories. These supplemental answers came on the very last day of discovery, after Plaintiffs had come to the limit of their allotted number of depositions. Furthermore, the supplemental answers identified forty additional new witnesses; yet Plaintiffs, honestly acknowledging that they had some idea of who thirty-four of the forty new witnesses were, only sought to bar testimony of the six whom they had never heard of. (R. 626, Ex. V, 9/7/05 Tr. at 6-7.) In addition, during the September 7, 2005 hearing, Defendants admitted that two of the six witnesses had not been named earlier due to "an oversight" by Defendants (*id.* at 9), and although a third witness who was in charge of Gackowski's academy training class had been "recently disclosed," defense counsel could not say "a hundred percent" that the witness' name had not already been mentioned in Gackowski's personnel files. (*Id.* at 8-9). Barring these six witnesses' testimony was not prejudicial to Defendants; rather, allowing these witnesses to testify—whom Defendants knew or should have known of earlier—would have been prejudicial to Plaintiffs.

Also on September 7, 2005, the Court noted that the motion to bar the statement and testimony of a former correctional officer named Dargis was premature and denied it *without prejudice*. (*Id.* at 16.) Although Plaintiffs did not produce Dargis' statement until August 26, 2005, that was only two to three days after Plaintiffs received it. (*Id.* at 12.) Plaintiffs then immediately sought leave from the Court to take Dargis' deposition, which the Court granted. (*Id.*) Because Dargis' deposition had not yet occurred, this Court properly found that the motion to bar Dargis' trial testimony was premature, and the Court denied the motion "without prejudice to its renewal once we learn more about the circumstances of this statement[.]" (*Id.* at 16.)

16

## 12. October 5, 2005

Defendants next claim this Court's denial of Defendant Cook County's request for a protective order to prevent Plaintiffs from directly contacting the Cook County Board of Commissioners and its Litigation Subcommittee, (R. 404, 10/5/05 Order), demonstrates this Court's bias because the Cook County Board of Commissioners is "an ultimate client in the case." (R. 645, Ex. G, Defs.' Am. Jt. Mot. at 14.) Indeed, "[a] county in Illinois is a necessary party in any suit seeking damages from an independently elected county officer (sheriff, assessor, clerk of court, and so on) in an official capacity. Because state law requires the county to pay, federal law deems it an indispensable party to the litigation." *Carver v. Sheriff of LaSalle County, Ill.*, 324 F.3d 947, 948 (7th Cir. 2003) (citations omitted). The law, however, is not clear as to whether the Cook County Board of Commissioners or its Litigation Subcommittee are, by extension, also indispensable parties to the litigation.

Either way, Plaintiffs' attorneys are permitted to contact Cook County officials directly. American Bar Association Formal Opinion 97-408 specifically states that under Model Rule 4.2, it is permissible for a plaintiff's attorney to communicate directly with government officials who have the authority to take action on a litigation matter, including settlement. The Cook County officials voluntarily spoke with Plaintiffs' attorneys, and the Court determined that defense counsel was adequately capable of instructing its client not to talk to Plaintiffs' counsel if that was counsel's wish. Additionally, two members of the Cook County Board's Litigation Subcommittee have participated in this Court's settlement conferences in this case along with defense counsel. For all of these reasons, this Court's refusal to grant Defendants' motion for a protective order was proper.

17

Additionally, Defendant Sheahan complains about this Court's ruling allowing Plaintiffs to depose Sheahan for an additional two hours. (R. 645, Ex. A, Am. Sheahan Aff. at 10-11.) This Court allowed the additional time because defendant Sheahan arrived late to his deposition, gave non-responsive answers, and refused to sit for the allotted six hours. (R. 396, Pls.' Mot. to Require Sheriff Sheahan to Complete Dep. at 2-3.) This Court allowed the extra deposition time to remedy this obstructionist behavior, which Defendants' attorneys failed to remedy.

### 13.     October 11, 2005

Defendants also assert that two rulings this Court made on October 11, 2005, demonstrate his bias against them. (R. 645, Ex. G, Defs.' Am. Jt. Mot. at 14-15.) First, the Court allowed Plaintiffs to issue additional subpoenas for documents pertaining to complaints of excessive force even though discovery had closed. Plaintiffs explained that their expert wanted medical records of seven inmates for limited time periods to complete his expert opinion, and that they would not need any follow-up discovery. Plaintiffs attributed their delay in requesting these documents to Defendants' delay in providing other requested documents and the expert's recent realization that he needed additional documents. (R. 626, Ex. X, 10/11/05 Tr. at 5-6.) Defendants argued that the documents were irrelevant because they were partly from a period after Plaintiffs left their positions at the Cook County Department of Corrections ("CCDOC"). (*Id.* at 7-8.) Medical records from the months immediately following Plaintiffs' employment at CCDOC, however, are relevant to injuries to inmates that may have occurred during Plaintiffs' tenure. This Court allowed finite, limited document requests after concluding that doing so would not prejudice Defendants.

Second, Defendants complain that the Court denied their motion to re-depose Plaintiffs

after the close of discovery in light of written memoranda that Plaintiffs produced after their depositions and the close of discovery.[10] (R. 645, Ex. G, Defs.' Am. Jt. Mot. at 14.) Defendants fail to note that the Court denied this motion *without prejudice*. While Defendants argued to the Court that they were entitled to re-depose Plaintiffs because of inconsistencies between their deposition testimony and the written memoranda, they did not provide any examples of the inconsistencies that would necessitate more than the thirty-five collective hours Defendants already used to depose Fairley and Gackowski. (R. 626, Ex. X, 10/11/05 Tr. at 14.) Thus, the Court gave Defendants leave to re-file their motion with examples of the alleged inconsistencies, but Defendants chose not to do so.

Defendants contend that these rulings show that Plaintiffs changed their interpretation of the document requests over time and that this Judge granted their motions to compel in accordance with those changes "almost as a matter of routine." (R. 645, Ex. G, Defs.' Am. Jt. Mot. at 15 n.4.) This Court's interpretation of Plaintiffs' document requests did not change. Instead, it was Defendants' ever-narrowing interpretation of Plaintiffs' document requests and Defendants' routine refusal to produce requested documents that led this Court to grant several motions to compel.

### 14. October 25, 2005, and November 17, 2005

Defendants assert that this Court's ruling permitting references to the existence of the *Fields* litigation but prohibiting references to the outcome of that litigation further demonstrates this Court's bias against Defendants. (*Id.* at 16-18.) References to the existence of the *Fields*

---

[10]Plaintiffs produced the cited written memoranda on October 5, 2005, after discovering that the memoranda—which Plaintiffs had previously withheld as subject to attorney-client privilege—may have been given to a third party. (R. 638-2, Pls.' Resp., Ex. 3, 10/4/05 Letter.)

litigation is relevant and proper in this case because it is evidence of Defendants' alleged motive to harass and retaliate against Plaintiffs. The Court ruled that the outcome of the litigation would not be admissible under Federal Rule of Evidence 403 because its prejudicial effect substantially outweighs its probative value. *See Fisher v. Krajewski*, 873 F.2d 1057, 1061-64 (7th Cir. 1989) (affirming decision to exclude decision in related case because it "would have usurped the jury's freedom to assess the credibility of each and every witness"); *see also Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338 1351 (3rd Cir. 1975) (noting that "[a] jury is likely to give a prior verdict against the same defendant more weight than it warrants."). Additionally, the *Fields* verdict is inadmissible hearsay. *Greycas, Inc. v. Proud*, 826 F.2d 1560, 1567 (7th Cir. 1987). Defendants did not challenge the correctness of this ruling, but rather the fact that they were not allowed to brief the matter. (R. 645, Defs.' Am. Jt. Mot. at 16-17.) Especially in a case of this magnitude, where the Court has had to resolve 146 contested motions, the need to resolve some discovery issues without full briefing is obvious. This is especially so when the ruling is strongly rooted in the Federal Rules of Evidence.

On November 17, 2005,[11] the Court denied Defendants' motion to reconsider or clarify its October 25, 2005 ruling. (R. 626, Ex. K, 11/17/05 Tr. at 9, 12.) Defendants do not explain why the Court's refusal to grant their motion for reconsideration demonstrates bias. This Court stands by its ruling as a proper application of the Federal Rules of Evidence. The fact that Defendants are unhappy with the outcome cannot support their assertion of bias. *See Liteky*, 510 U.S. at 555 (stating that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion").

---

[11]Defendants' affidavits erroneously state that this ruling occurred on November 9, 2005.

### 15.    January 12, 2006[12]

Defendants contend that this Court's denial of their motion to bifurcate the *Monell* claims

at trial demonstrates this Court's bias against them.  Their only argument in support of this

assertion is that "Judge Castillo completely ignores the prejudice to Defendants[.]" (R. 645, Ex.

G, Defs.' Am. Jt. Mot. at 18-19.)  Again, Defendants' own brief demonstrates that the only basis

for the bias assertion with respect to this ruling is that they did not agree with the outcome.  In its

four page written opinion, this Court carefully considered Defendants' motion to

bifurcate—along with the reply brief and the supplemental reply brief that this Court allowed

over Plaintiffs' objections—and found that there would be no prejudice to the Defendants in

trying the *Monell* claims together with the individual claims.  (R. 597.)  Whether to bifurcate

claims at trial is a matter within this Court's sound discretion, and Defendants have provided no

evidence that the Court's exercise of discretion in this matter was anything but proper.  *See*

*Treece v. Hochstetler*, 213 F.3d 360, 364-65 (7th Cir. 2000).

### 16.    January 17, 2006

Defendants complain that this Court granted Plaintiffs' motion to strike their

supplemental statement of undisputed facts in support of their summary judgment motions.  (*See*

R. 645, Ex. A, Sheahan Am. Aff. at 15.)  While the Local Rules permit Defendants to respond to

Plaintiffs' assertion of undisputed facts, they do not permit Defendants to assert new facts in

support of their summary judgment motion after Plaintiffs have responded.  L.R. 56.1(a).  It is on

this basis—not out of any anti-Defendant bias—that Plaintiffs' motion was granted.

Finally, Defendants assert that this Court is biased because it allowed Plaintiffs to re-

---

[12]Defendants erroneously claim that this ruling occurred on January 17, 2006.

21

write a protective order. (*Id.*) Defendants do not explain how this caused them prejudice or harm. Nor have they suggested why this action is indicative of bias.

## B.    Communication with Prospective Jury

Defendants' allegation that this Judge intends to tell the jury that the defense of this case is a waste of taxpayer dollars is simply untrue. (R. 645, Ex. G, Defs.' Am. Jt. Mot. at 4.) This Court intends to do nothing of the sort, and nothing in any comments this Court has made justifies an inference to the contrary. (*See* 3/1/06 Tr. at 15-16.) The comment that Defendants rely on is:

> I will tell you, I think what is going on here is a travesty in terms of a misexpenditure of public funds, that somebody should be held accountable. And if I go through this trial with a bunch of jurors, if I go through this trial, I will be very vocal about that on a public record; and if there is a verdict for the plaintiff, I will not end my criticism of the decisions that were made in this case, and I intend to make every defense counsel bare their records as to how much money has been paid by the taxpayers in this county. That's were I intend to go with this.

(R. 626, Ex. J., 11/9/05 Tr. at 8.) This Court stated and meant that "if I go through this trial" and "if there is a verdict for the plaintiff," *then* "I will be very vocal" and "I will not end my criticism of the decisions that were made in this case" about the misexpenditure of public funds. Defendants' strained reading of this passage and inflammatory accusation that this Court would commit an ethical violation belie not only the record but common sense, as such a comment to the jury would necessarily result in a mistrial. In every trial before this Court, this Court admonishes jurors not to read anything about the case in the media or elsewhere nor to discuss this case with anyone. Nothing in this Court's statements justify Defendants' insinuation that any other procedure would be followed in this case.

22

## C. Comments Made in the Context of Settlement Discussions and Referencing the Cost of this Litigation

It is no secret among members of the federal bar that this Court strongly encourages an early and constant assessment of settlement possibilities in order to avoid the "winner take all" outcome that litigation often presents. In fact, in certain instances after both parties have devoted significant resources to a lawsuit, it is difficult to distinguish the winner from the loser. This lawsuit clearly falls into that category.

This Court has personally held three lengthy settlement conferences in this case and has repeatedly made additional offers to hold more conferences in chambers which Defendants have rejected. None of the comments made or matters discussed in the course of these settlement conferences have been publicized. All such comments are covered by the settlement privilege. *See* Fed. R. Evid. 408. This Court has never breached that privilege during the public proceedings on this lawsuit.[13]

Defendants assert that comments this Court made during the course of settlement

---

[13]This Court is concerned, however, that the rules of this Court have been breached by the publication of Plaintiffs' specific settlement demand in the media. *See* Abdon M. Pallasch, *Sheriff: Biased Judge Should Quit Jail Beating Case*, Chi. Sun Times, Feb. 27, 2006, *available at* http://www.suntimes.com/output/news/cst-nws-bias27.html. At a status hearing held on March 14, 2006, all counsel with one glaring exception—defense attorney John T. Roache of the law firm of Bell, Boyd & Lloyd, LLC—denied disclosing Plaintiffs' specific settlement demand to the media. (*See* 3/14/06 Tr. at 9.) All settlement discussions and demands in this case are inadmissible at trial pursuant to Fed. R. Evid. 408. Local Rule 83.53.6 prohibits any extrajudicial statements to the public media that a lawyer knows or reasonably should know would be inadmissible as evidence in a trial. There can be no question that Plaintiffs' settlement demand is inadmissible at the trial of this case. The dissemination of Plaintiffs' specific demand to a member of the media can only serve to prejudice Plaintiffs by setting a numeric "cap" on their damages or by seeking to depict Plaintiffs as being driven solely by monetary concerns. Therefore, this Court has no choice but to refer this matter to this Court's Executive Committee for appropriate potential disciplinary proceedings against any member of this Court's bar who violated L.R. 83.53.6(b)(6).

discussions or in referencing those conferences should be the basis for recusal. For the reasons set forth below, this Court strongly disagrees.

### 1. Admonishments of Defense Counsel and Litigation Subcommittee

Defendants claim that this Court has "baselessly" accused Defendants' counsel of improper motives in their defense of this case. (R. 645, Ex. A, Sheahan Aff. ¶ 5.) This Court, rather than "accusing" Defendants of anything "baseless," has repeatedly noted that the parties' unwillingness to heed the Court's reasonable recommendations in the context of settlement negotiations has contributed to the astronomical cost of the present litigation. These recommendations were supported by this Court's even-handed analysis of the facts presented by the parties in those settlement conferences, the risks to the parties of trying this case before a jury, and this Court's twelve years of experience in presiding over civil rights cases. Only after spending hours presiding over fruitless settlement discussions in which Defendants' counsel repeatedly cited the Litigation Subcommittee's unwillingness to accept this Court's recommendations did this Court form a well-founded concern that:

> Well, I think the Litigation Subcommittee is good at rejecting things, but what they're not good at is evaluating litigation, and that's unfortunate. So if they want to take the position, which I think is probably not the unanimous view, but the problem is I have defense attorneys who have a self-interest, their own pocketbook, and they're lining their pocketbook with taxpayer money at this point, and I'm wondering if the Litigation Subcommittee has considered that.

(*See id.*, ¶ 8.) This statement represents an informed observation by this Court that the Litigation Subcommittee had not fully considered the benefits of settlement given the risks incumbent in trying this case.

A judge may properly form an opinion "on the basis of facts introduced or events

24

occurring in the course of the current proceedings . . . unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555. This Court's comments have all been appropriately based on matters learned by this Court through its more than two and a half years presiding over this case. *See id.* at 554-56. As the Supreme Court has recognized:

> judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible . . . . *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration--even a stern and short-tempered judge's ordinary efforts at courtroom administration--remain immune.

*Id.* at 555-56 (emphasis in original). Thus any comments this Court has made regarding its opinion that the Litigation Subcommittee has exercised poor judgment are simply not the sorts of statements that justify an accusation of bias.

Defendants' suggestion that this Court's admonishment of their attorneys' conduct justifies recusal is also erroneous. Ordinarily, an allegation of judicial bias relates to bias against a party, not a party's attorney. *Charron v. U.S.*, 200 F.3d 785, 788-89 (Fed. Cir. 1999). A judicial bias against the lawyer only warrants recusal where it becomes so pervasive that the client's rights are likely to be affected. *See id.* In *Charron*, the district judge accused a party's attorney of malpractice, defrauding the court, filing a frivolous action, and doctoring the record. *Id.* at 788-89. In addition, the party claimed that the judge prevented the attorney from conferring with his client on certain occasions. *Id.* The Federal Circuit held that "[t]he judicial

comments and actions upon which the [parties] rely . . . merely reflect [the judge's] evaluation and criticism of [the attorney's] handling of the cases and her perception that his professional performance was severely deficient." *Id.* at 789. Such comments did not warrant recusal. *Id.* Similarly, here the cited comments merely reflect this Court's opinions regarding the inappropriate handling of this case by Defendants' attorneys and simply do not rise to any level which would justify Defendants' current accusation of bias.

### 2.     Comment Regarding the Misexpenditure of Taxpayer Money

One serious problem posed by this hotly-disputed litigation is that both sides may be paid by the Cook County taxpayers. Plaintiffs' attorneys will, of course, only receive fees if they prevail. In that circumstance, those fees and any judgment for Plaintiffs would be paid by the taxpayers of Cook County. Defendants' private counsel are all being paid with public funds. The cost of defending this litigation has already significantly exceeded early possibilities for a cost-effective settlement. Any such possibility was rejected by Defendants' attorneys. Given that reality, this Court has expressed its concern that taxpayer dollars are being misappropriated in this case. Specifically, this Court has stated that:

- "[I]t's the opinion, very strong opinion, on my part that this is going to lead to a waste of taxpayers' money, and it already has, with no insult to defense counsel. But the fact that I've paid for you all to be here in this courtroom and that, more importantly, a lot of other people that don't make as much money as I do have paid, I think it's very sad to me." (R. 626, Ex. L, 1/26/06 Tr. at 6-7.)

- "I'm also concerned, I will tell you this, just as a Cook County taxpayer, about the amount of money that is being spent in this case. You know, all the taxpayers in Cook County paid their property tax bills on November 1st. How much have the defendants spent in attorneys fees in this case? I think we could have had the case settled already." (*Id.*, Ex. J, 11/9/05 Tr. at 4.)

- "I think there should be some public accounting of how this money is being spent at this

26

point, and I really call on the sheriff to take a look at this and the County board to take a look at this because this is a misexpenditure of public funds. This is not like a company just spending money." (*Id.* at 5.)

Defendants assert that this Court's statements demonstrate bias because: (1) this Court seeks to encourage settlement in this purportedly "meritless" case; and (2) this Court's pecuniary interest in this litigation as a taxpayer of Cook County "is the reason for" his opposition to Defendants' defense of this case. (R. 645, Ex. G, Defs.' Am. Jt. Mot. at 4-6.) None of these statements indicate that this Court has a pecuniary interest in this litigation. A pecuniary interest, such as that of a taxpayer, "which a judge has in common with many others in a public matter is not sufficient to disqualify him." *In re City of Houston*, 745 F.2d 925, 930 (5th Cir. 1984) (citation omitted); *Draper v. Reynolds*, 369 F.3d 1270, 1281 n.17 (11th Cir. 2004), *cert. denied*, 534 U.S. 988 (2004) (holding that a judge's general interest as a resident, taxpayer, and property owner does not require recusal in cases where the local sheriff's department was a party). Not even all financial interests are disqualifying. A judge's "slight pecuniary interest" in the outcome of a case, and therefore merely a "possible temptation" to be biased, does not require recusal. *Del Vecchio v. Ill. Dept. of Corr.*, 31 F.3d 1363, 1374 (7th Cir. 1994). A judge's pecuniary interests are not grounds for recusal if they are not "direct, personal, and substantial". *Id.*

This Court's encouragement of settlement in this case has nothing to do with any pecuniary or personal interest by this Court or any personal concern about paying taxes related to this lawsuit. This Court has encouraged settlement of this case from an early date because the Court believes the taxpayers could be the ultimate financial losers in this case. This Court has made that clear during settlement conferences and on the record: "[a]nd I will, in a serious vein, be talking about resolving this case over and over again because I think a mistake is being made

27

that is a travesty to the taxpayers of the county." (R. 626, Ex. I, 2/1/06 Tr. at 5.) Thus, there is

no support for Defendants' accusation that this Court's comments regarding expenditure of

taxpayers' money is linked to any pecuniary interest that might warrant refusal. The Court

acknowledges that it probably pushed too hard to settle this lawsuit because of its general

concerns for the Cook County taxpayers. The Court's expressed concerns, however, do not

require its recusal.

### 3. Willingness to Speak Publicly Regarding Expenditure of Public Funds

Defendants also argue that this Court's statements indicating its willingness to speak

publicly regarding Defendants' expenditure of public funds in litigating this case justify recusal.

This Court has made the following statements in this regard:

- "I'm going to raise this issue, I'm going to keep raising it, I'm going to publicly raise it, and I'm going to talk about it as often as I can. And if this case goes all the way to verdict and the verdict comes out as I think it's going to be, there will be a price to be paid, I think, in the public where this should be debated, and it's a huge price." (R. 626, Ex. K, 11/17/05 Tr. at 7-8.)

- "And if I go through trial with a bunch of jurors, if I go through this trial, I will be very vocal about that on a public record; and if there is a verdict for the plaintiff, I will not end my criticism of the decisions that were made in this case, and I intend to make every defense counsel bare their records as to how much money has been paid by the taxpayers in this county. That's where I intend to go with this." (*Id.*, Ex. J, 11/9/05 Tr. at 8.)

- "I'll be talking loud and clear about that, loud and clear. And I think just from my experience last week, my voice does get heard from time to time. So I'll be turning my attention to what's going on in Cook County government pretty soon." (*Id.*, Ex. I, 2/1/06 Tr. at 5.)

None of these statements threaten Defendants' ability to receive a fair trial in this case. As

described above, any potential jurors would be rigorously screened to ensure they had no prior

familiarity with this case or any comments made about this case. (*See* 3/1/06 Tr. at 15-16.) For

28

the reasons set forth in section 2, *supra*, none of these comments support an accusation of bias that would warrant recusal in this case.

### 4. Comments Regarding the Merits of Case

Defendants also claim recusal is necessary in this case because this Court has made comments "inferring that Plaintiffs will win this case." (R. 645, Ex. G, Defs.' Am. Jt. Mot. at 2.) Though their brief is less than clear on this point, it appears that Defendants object to comments this Court made in open court on February 24, 2004, and during a settlement conference on December 13, 2005. On February 24, 2004, this Court stated that "I will receive any motion for summary judgment with a little bit of skepticism, and the closer you file it to the trial date, the higher the skepticism goes." (R. 626, Ex. N, 2/24/04 Tr. at 4.) This Court's comments regarding summary judgment applied equally to Plaintiffs and Defendants in this case, undermining Defendants' accusation that this statement reflects this Court's bias against them. As defense counsel well knows, any time a primary issue in a case is the credibility of a key witness, summary judgment is difficult to attain. *See United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1265-66 (7th Cir. 1990) (stating that where an issue requires "weighing the credibility of witnesses or the facts in question, summary judgment is inappropriate."). Defense counsel has made it clear that a primary defense in this case is their position that Plaintiffs are lying to gain a windfall from the County. (*See, e.g.*, Ex. I, 2/1/06 Tr. at 7.) As a result, this Court's expression of skepticism about the appropriateness of summary judgment is perfectly reasonable. *See, e.g., In re Mann*, 229 F.3d 657, 659 (7th Cir. 2000) (finding that district judge's comment that a party's motion would probably be denied is not enough to prove bias); *see also Hook*, 89 F.3d at 355 (finding that district judge's criticism of a

motion was insufficient to demonstrate bias).

This Court has made clear that any skepticism regarding the filing of summary judgment motions sprang from the nature of the case in general rather than any assessment of the merits of either side's case: "I don't think this case would resolve itself fully on a motion for summary judgment, but I'm not going to prejudge that. But that's just my inkling." (R. 626, Ex. N, 2/24/04 Tr. at 4.) Furthermore, the Court's comment regarding the timing of the summary judgment filing stemmed from this Court's experience that summary judgment motions filed on the eve of trial are often tenuous and aimed at causing delay. Finally, it should be noted that this Court did not summarily reject Defendants' summary judgment motions when they became fully briefed. Instead, the Court's chambers were fully engaged in attempting to resolve these motions when Defendants filed their motions for recusal more than one month later.

Defendants also object to this Court's comments during a settlement conference that took place on December 13, 2005. Defendants assert that during that conference this Court likened the continued defense of this case to Vietnam and informed the parties that he believes Plaintiffs will likely prevail at trial and the County will be forced to pay Plaintiffs' attorneys' fees. (R. 645, Ex. G, Defs.' Am. Jt. Mot. at 18.) This Court is more than entitled to assess the merits of the parties' cases in the course of settlement discussions, and this Court's analogy to Vietnam simply conveyed its opinion—proven true over the course of this litigation—that often there is no winner in a case like this when parties refuse to consider reasonable settlement offers and litigation drags on.

Indeed, there would be little point to judicial involvement in settlement talks if a judge were not permitted to make recommendations based on his perceptions of the merits of the case

as presented by the parties' evidence. The Sixth Circuit very recently acknowledged this matter of common sense in *Bell v. Johnson*, 404 F.3d 997, 1005 (6th Cir. 2005). In that case, a former state prison inmate had sued corrections officers at the Michigan Department of Corrections alleging First Amendment retaliation. After a jury found one of the defendants liable for a minimal amount of compensatory damages, the district judge granted the plaintiff's motion for a new trial on damages, finding that the failure to award punitive damages was against the great weight of evidence at trial. *Id.* at 1001-1002. At a status conference that took place off the record in the judge's chambers a month later, the trial court allegedly informed the corrections officers' counsel that he should inform his supervisor that the court would try the case as many times as necessary until a jury reached a verdict of at least $9,000, and the judge handed counsel for both sides a note left over from the jury deliberations which presumably showed several possible damage amounts. *Id.* at 1005-06. The Sixth Circuit held that these allegations, even if true, do not demonstrate judicial bias because this "was simply an effort by the district judge to facilitate a settlement potentially advantageous to both parties by providing them with more complete information about the potential outcome of a new trial." *Id.* Moreover, the judge's actions were properly based on facts introduced or events occurring in the course of the proceedings. *Id.* at 1006.

This Court's comments regarding the merits of the instant case made in the course of settlement negotiations do not warrant recusal for the same reasons. Both parties were present when these comments were made, and they were based on this Court's honest assessment of the case based on the facts introduced to the Court by counsel. Numerous Circuits agree that these

31

kinds of comments do not necessitate judicial recusal.[14] As the Supreme Court has held,

"opinions formed by the judge on the basis of facts introduced or events occurring in the course

of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or

partiality motion unless they display a deep-seated favoritism or antagonism that would make fair

judgment impossible."[15] *Liteky*, 510 U.S. at 555. Nothing this Court said regarding the strength

of Plaintiffs' case displays the "deep seated antagonism" toward Defendants or favoritism toward

Plaintiffs that could indicate an actual bias. *Id.*

---

[14]*See, e.g., U.S. v. Wallace*, 250 F.3d 738 (5th Cir. 2001) (finding that a district judge's statements made in chambers to attorneys and outside the presence of the jury, expressing concern regarding the parties' and attorneys' conduct "were within the ambit of opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings" and did not raise a serious question of impartiality); *West v. Johnson*, 92 F.3d 1385, 1411 (5th Cir. 1996) (noting that judge's statement that "the only action this Court would like to be involved in the future with regard to [plaintiff] would be to see the motherf****r fried," was "obviously based on matters learned at trial and, though inappropriate, does not reveal such a high degree of favoritism or antagonism as to make fair judgment impossible") (internal quotation omitted); *Price v. Kramer*, 200 F.3d 1237, 1253 (9th Cir. 2000) (holding that a statement which simply conveys the court's evaluation of which side had the better case does not indicate bias); *PeopleHelpers Found., Inc. v. City of Richmond*, 12 F.3d 1321, 1325-26 (4th Cir. 1993) (finding that a judge's comments about his perception of a defendant's conduct, "while perhaps caustic," were "made in an effort to further the settlement process;" and accordingly, "we cannot conclude that a reasonable person would question his impartiality."); *In re Martinez-Catala*, 129 F.3d 213, 219 (1st Cir. 1997) (stating that "in pressing each side to take a reasonable view of its situation, judges often give the parties the court's impression of apparent strengths and weaknesses. There are dangers in this practice, of course, but clients are often well served by settlements, and settlements often result from realistic appraisals of strengths and weaknesses."); *see also U.S. v. Larson*, 110 F.3d 620, 623 (8th Cir. 1997) (finding that a trial judge who admitted that his comments expressing disapproval of plea agreement were contrary to Federal Rule of Criminal Procedure 11(e) did not display such a "deep-seated favoritism or antagonism that fair judgment is impossible") (quoting *Liteky*, 510 U.S. at 555).

[15]The Supreme Court used as an example of such a high degree of antagonism the statements by the District Judge in *Berger v. United States*, 255 U.S. 22, 28 (1921), who stated that "[o]ne must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Liteky*, 510 U.S. at 555.

32

### 5. Comment Equating the Misexpenditure of Taxpayer Dollars with Corruption

Defendants' motion places much emphasis on the following passage from a hearing on February 1, 2006, as demonstrating this Court's bias against them:

> And I will, in a serious vein, be talking about resolving this case over and over again because I think a mistake is being made that is a travesty to the taxpayers of this county. And I think just about every single property owner just received their property bill. I know I received mine. I think all of you got yours. . . .And I say in all seriousness because while this is not a public corruption case, any time taxpayer money is wasted, that, to me, is the equivalent of corruption. So while somebody might not be going to jail, when you misuse your office the way I see an office being misused, I think somebody needs to pay attention to what's going on, and any categorization of the plaintiffs' case as just another prisoner case really is a disservice to the plaintiffs' positions as former Cook County employees."

(R. 645, Ex. G, Defs.' Am. Jt. Mot. at 3-4 (citing R. 626, Ex. I, 2/01/06 Tr. at 5-6).) These comments represent a more forceful statement expressing this Court's frustration and dismay at the parties' inability and unwillingness to even consider a prudent settlement outcome and to instead continue to spend taxpayers' money and incur the risk that even more taxpayer money would be spent in the event of a victory for Plaintiffs. Upon reflection, the Court fully admits these statements were unfortunate and contain some unusually harsh rhetoric. Nevertheless, even these statements do not rise to the level necessary to demonstrate actual judicial bias. *See Liteky*, 510 U.S. at 555.

Defendants also cite this Court's comments at the same hearing that, "you can tell the good Sheriff before he becomes the outgoing Sheriff that I'm ready in my courtroom for trial. We're putting in a new carpet just for him, so look forward to that." (*Id.* at 3 (citing R. 626, Ex. I, 2/1/06 Tr. at 5).) As Defendants well know, this was the Court's poor attempt to inject levity into the constant stress of the contested and extended pretrial proceedings in this lawsuit. The

February 1st hearing was held in a different courtroom because new carpeting was being put in the undersigned's courtroom. Nothing in this comment evidences the level of antagonism necessary to justify Defendants' accusations that this Court has an actual bias against them.

## D.     Affiliation with Northwestern Law School

Perhaps the most egregious stretch in Defendants' attempt to demonstrate this Court's alleged bias is its reference to this Court's teaching position at Northwestern University Law School.[16] They suggest that they cannot receive a fair trial in this case because Northwestern Law School's Bluhm Legal Clinic represented the inmates in the underlying *Fields* litigation. As the First Circuit has recognized, "[a]ll judges come to the bench with a background of experiences, associations, and viewpoints. This background alone is seldom sufficient in itself to provide a reasonable basis for recusal." *Brody v. President & Fellows of Harvard College*, 664 F.2d 10, 11-12 (1st Cir. 1981) (holding that a judge's status as an alumnus of the defendant school "hardly seems likely to manifest itself in a bias" and did not warrant recusal). This Court has no personal relationship with any attorney or student who was involved in the *Fields* litigation through the Bluhm Legal Clinic nor any special knowledge regarding that litigation as the result of its teaching post. (*See* 3/1/06 Tr. at 13.) There simply is nothing to support Defendants' suggestion that this Court is in any way unable to preside fairly over this case given the lack of any substantive overlap between its limited, once-a-week evening teaching duties and the Bluhm Legal Clinic's work in the *Fields* litigation. As a result, recusal on the basis of this relationship is unwarranted. *See, e.g.*, *Wu v. Thomas*, 996 F.2d 271, 275 (11th Cir. 1993)

---

[16]This assertion is present only in the affidavits of defendants Andrews, Bercasio, Coffey, Fermaint, Loizon, and Prohaska. (R. 647, Defs.' Mot. to Withdraw, Exs. 2-7 ¶ 8.)

(holding that judge need not recuse himself where he held a position as an adjunct professor at a university that was a party-defendant).

This Court has no actual bias against Defendants. In fact, as indicated on the record, the Court's examination of all the cases it has handled during its entire judicial career regarding the Sheriff have resulted in judgments in favor of the Sheriff and his employees or in pre-trial settlements. (3/1/06 Tr. at 15.) All of these cases were handled by the Cook County State's Attorneys Office or other private attorneys without incident.

## II.     Appearance of Bias Pursuant to 28 U.S.C. § 455(a)

The cases discussed above upheld the district judge's decision not to recuse himself or herself under both section 144 and section 455(a). However, though this Court can state without hesitation that nothing in Defendants' briefs or affidavits sufficiently demonstrates this Court's actual bias, after a careful evaluation of the record and transcripts in this case, this Court finds that reasonable minds may disagree as to whether recusal is appropriate in this matter under section 455(a). As explained above, 28 U.S.C. § 455(a) requires a district judge to recuse himself if a reasonable person would perceive a significant risk that the judge will resolve the case on a basis other than the merits. *Hook*, 89 F.3d at 354. In applying this standard, the Court must bear in mind that these "outside observers are less inclined to credit judges' impartiality and mental discipline than the judiciary itself will be." *Matter of Hatcher*, 150 F.3d 631, 637 (7th Cir. 1998) (citations omitted). Whether a "reasonable person," rather than a "hypersensitive or unduly suspicious person," would perceive a significant risk that this Court will resolve the case on a basis other than the merits is a difficult question in light of these circumstances. This Court reluctantly concludes that recusal is the most prudent course in this matter pursuant to 28 U.S.C.

35

§ 455(a).

In this case, none of this Court's individual statements, when viewed in their proper context, warrant recusal under section 455(a). However, in doing the required self-evaluation under this section, this Court finds that all of this Court's statements and interactions with Defendants in this case, taken together, may give pause to a non-legal observer, not versed in the ways of the courtroom and the risks of litigation. This Court candidly admits that its statements on February 1, 2006, regarding public corruption and Defendants' obstinate refusal to consider settlement were a mistake in judgment by this Court. Perhaps because this status hearing occurred shortly after this Court had issued a public corruption sentencing opinion, *see United States v. Spano, et. al,* __F. Supp. 2d__, 2006 WL 212146, *1 (N.D. Ill. Jan. 24, 2006) (upholding a public corruption sentence), this Court had the general topic of public corruption on its mind when it made the unfortunate statements. This Court tried to make it clear that it was not accusing Defendants of public corruption. Instead, the Court's primary concern was the continued, seemingly mindless expenditure of public funds in Defendants' draconian defense of this lawsuit. In hindsight, a good argument could be made that this Court should have referred the difficult discovery proceedings to the capable Magistrate Judge assigned to this lawsuit instead of following its usual "hands-on" approach and becoming frustrated by Defendants' attorneys' ill-advised decision to contest almost every issue in this lawsuit while absolutely refusing to consider any type of reasonable settlement. This Court admits in retrospect that it may have pushed too hard to reach a compromise settlement in this lawsuit. The Court did not intend to have its colorful statements coerce a settlement between the parties. The Court will avoid these types of statements in the future.

After careful evaluation of this Court's unfortunate public corruption statements—especially in the wider context of the Court's negative interactions with Defendants' counsel during the contested and extended pretrial proceedings—this Court ultimately concludes the reasonable person standard under section 455(a) has been satisfied and that this Court's recusal is required. This Court feels it must find in the affirmative, using the utmost caution so that Plaintiffs will not be prejudiced by any imagined, contrived, or perceived grounds for appeal that Defendants might use if they ultimately lose at trial. In addition, this Court recuses itself out of utmost caution for the judicial system as a whole because "if a judge proceeds in a case when there is (only) an appearance of impropriety in his doing so, the injury is to the judicial system as a whole and not to the substantial rights of the parties." *U.S. v. Troxell*, 887 F.2d 830, 833 (7th Cir. 1989). "Judges may choose to step aside in close cases; the 'duty to sit' concept has been modified by amended section 455." *Martinez-Catala*, 129 F.3d at 221.

## CONCLUSION

This Court recuses itself reluctantly because it is mindful that a sister or brother Judge will be left with this hotly contested piece of litigation, its remaining contested motions, and the possibility of a full-blown trial that unfortunately may mirror the hostile nature of pre-trial proceedings. In accord with the Seventh Circuit, this Court is concerned that future litigants dissatisfied with various rulings received from their trial judge may try to use Section 28 U.S.C. § 455(a) to achieve "a system of peremptory strikes and judge-shopping." *Hook*, 89 F.3d at 354 (citation omitted). This Court concurs with the fear expressed by the Seventh Circuit, that "putting disqualification in the hands of a party, whose real fear may be that the judge will apply rather than disregard the law, could introduce a bias into adjudication," rather than eradicate it.

37

*Id.* Some litigants, especially in hotly disputed cases, will predictably file such motions in the future. Despite these concerns, this Court feels it must allow this lawsuit to proceed before another judge. The Court apologizes to the parties, their attorneys, and to its dear colleague who will receive this case. In a final attempt to reach some agreement in this case, the Court asked the parties if they would allow the reassignment of this lawsuit to an unnamed, volunteer senior judge with the blessing of this Court's Executive Committee so that this case would not unduly burden any active judge. Of course, true to form, the parties did not agree to this procedure. Thus, this Court hereby requests the Executive Committee to randomly assign this lawsuit and will gladly accept any corresponding case transfer from the judge who receives this case.

The public has a right to know what is really going on at the Cook County jail. Unfortunately, as recently publicized, the problem of prisoner and correctional officer safety continues. *See* Gary Wisby, *Three Inmates Stabbed in Two Fights at Cook County Jail*, Chi. Sun Times, Mar. 13, 2006 at 4; *Guard Charged in Jail Break*, Chi. Sun Times, Feb. 16, 2006; Annie Sweeney, *Inmate Flees Jail in Laundry Truck*, Chi. Sun Times, Feb. 12, 2006; Stefano Esposito, *Officials: We Know Who Shot 3 in County Jail*, Feb. 9, 2006; Steve Patterson, *Sheriff Gets No Help to Hire Court-Ordered Jail Guards*, Chi. Sun Times, Jan. 12, 2006; Jeff Coen, Todd Lighty, *Report Hints Wider Jail Abuse*, Chi. Tribune, Sept. 18, 2004; Jeff Coen, Steve Mills, Maurice Possley, *Report: Sheahan Played Dumb*, Chi. Tribune, Sept. 17, 2004; Jeff Coen, *Jail Report Criticizes Sheriff*, Chi. Tribune, Sept. 16, 2004; Jeff Coen, *County Jail Beatings Bring Outcry*, Chi. Tribune, Aug. 8, 2003; Steve Mills, Maurice Possley, *Mass Jail Beating Covered Up*, Chi. Tribune, Feb. 27, 2003. The public can rightly question the actions of all the public officials involved in this lawsuit and the manner in which this lawsuit has been defended,

including the petitions for recusal filed herein, which the public has unfortunately paid for.

As documented repeatedly in this opinion, Defendants' attorneys engaged in repeated obstreperous pretrial conduct. Defendants were themselves sanctioned for failure to comply with this Court's discovery orders on multiple occasions. While attorneys should be vigorous advocates for their clients—within the bounds of appropriate civil behavior—they are also supposed to act as counselors and give reasoned and principled legal advice to their clients. During the 965 days this Court has presided over this lawsuit, this Court has seen scant evidence that the attorneys for the moving Defendants understand these important principles.

This Court has nothing at stake in this litigation and has only attempted to guide this difficult litigation to a conclusion. On the other hand, Defendants' attorneys have gained financially from all of their behavior—some very questionable—without any apparent oversight by any Cook County officials. The public interest will at least be served in part by this ruling if, by resolution of allegations of misconduct at the Cook County jail, the parties and the public can respond to the problem without the distraction of these claims of judicial bias.

ENTERED: _____

**Judge Ruben Castillo**
**United States District Court**

**Dated: March 16, 2006**

39