IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | | |
|---|---|---|---|
| ROGER FAIRLEY and RICHARD GACKOWSKI, | ) | | |
| | ) | | |
| Plaintiffs, | ) | | |
| v. | ) | | |
| | ) | | |
| SUPT. DENNIS ANDREWS, LT. EDWARD BYRNE, SGT. PATRICK LOIZON, OFC. EVAN FERMAINT OFC. NOBERTO BERCASIO, OFC. FRED COFFEY, OFC. RONALD PROHASKA, INVESTIGATOR GREGORY ERNST, FORMER CHIEF INVESTIGATOR SAUL WEINSTEIN, CHIEF INVESTIGATOR TIM KAUFMANN, OFC. GABRIEL OCHOA, CHIEF INVESTIGATOR JUAN DIAZ, in their individual and official capacities, SHERIFF MICHAEL SHEAHAN, in his official capacity, and COOK COUNTY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | ) | No. 03 C 5207 |
| Defendants. | ) | | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Plaintiffs Roger Fairley and Richard Gackowski filed a Second Amended Complaint alleging that Defendants violated their First Amendment rights to the United States Constitution in violation of 42 U.S.C. § 1983. Before the Court are Defendants' Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c). For the reasons discussed in detail below, the Court grants in part and denies in part Defendant Sheriff Michael Sheahan's Motion for Summary Judgment. The Court grants in part and denies in part Defendant Edward Byrne's and Defendant Dennis Andrews' Motions for Summary Judgment. Further, the Court grants in part and denies in part Defendants Evan Fermaint's, Noberto Bercasio's, Fred Coffey's and

Ronald Prohaska's Motion for Summary Judgment. The Court also grants Defendant Juan

Diaz's, Defendant Patrick Loizon's and Defendant Gregory Ernst's Motions for Summary

Judgment in their entirety. Finally, the Court grants in part and denies in part Timothy

Kaufmann's and Saul Weinstein's Motions for Summary Judgment.

## BACKGROUND[1]

### I.      The Parties

Plaintiffs Roger Fairley and Richard Gackowski are former correctional officers at the

Cook County Department of Corrections ("CCDOC"), who resigned from the CCDOC on

February 4, 2003. (R. 447-1, Defs.' Joint Local Rule 56.1(a)(3) Stmt. Facts. ¶¶ 1, 2; R. 553-1,

Pls.' Corrected Rule 56.1(b)(3) Stmt. Add'l Facts ¶ 420.) During the relevant time period,

Defendant Dennis Andrews was the superintendent of Division I, Defendant Edward Byrne was

a correctional officer with the rank of lieutenant, and Defendant Patrick Loizon was a

correctional officer with the rank of sergeant at the CCDOC. (*Id*. ¶¶ 3-5.) Defendants Evan

Fermaint, Noberto Bercasio, Fred Coffey, and Ronald Prohaska were all correctional officers at

the CCDOC during the pertinent time period. (*Id*. ¶¶ 6-9.) Defendant Gregory Ernst was an

---

[1] The Court derives the background facts from the parties' Northern District of Illinois Local Rule 56.1 statements. The majority of Defendants' objections to Plaintiffs' Rule 56.1(b)(3) Statement of Facts are based on hearsay, although Defendants do not explain how or why each challenged statement is inadmissible hearsay. *See* Fed.R.Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."); *see also Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir. 1997) ("hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial."). Witnesses, however, may testify to their observations and give opinions based on their own personal knowledge. *See* Fed.R.Evid. 602, 701; *United States v. Joy,* 192 F.3d 761, 767 (7th Cir. 1999) ("Because most knowledge is inferential, personal knowledge includes opinions and inferences grounded in observations or other first-hand experiences.").

investigator with the Internal Affairs Division ("IAD") of the CCDOC and Defendant Saul Weinstein and Juan Diaz served as Chief Investigators at IAD. (*Id.* ¶¶ 10, 11, 14.) Defendant Timothy Kaufman was an investigator with the Cook County Sheriff's Police Department and Defendant Michael Sheahan served as the Sheriff of Cook County. (*Id.* ¶¶ 12, 15.) Cook County and Gabriel Ochoa are no longer Defendants in this lawsuit. (*Id.* ¶ 13.)

## II.     CCDOC Training Academy

Fairley attended the CCDOC Training Academy from October 31, 1994 until January 27, 1995. (*Id.* ¶ 55; Pls.' Stmt. Add'l Facts ¶ 1.) At his deposition, Fairley testified that while on a visit to Division II of the CCDOC with his training academy class, he witnessed a correctional officer take a pool stick and hit an inmate who was using crutches. (Pls.' Stmt. Add'l Facts ¶ 2; Defs.' Ex. 8, Fairley Dep. at 448-66.) Fairley further testified that the next day during class, an academy cadet complained about the incident. (*Id.* ¶ 4, Defs.' Ex. 8, Fairley Dep. at 463.) After that, Fairley stated that an academy instructor told Fairley's class that the cadets stick together and that they should not make bad remarks about anyone because "unity is the key." (*Id.* ¶ 6, Defs.' Ex. 8, Fairley Dep. at 462-63.)

Gackowski began training at the CCDOC Training Academy on June 12, 1995 and was part of the Class of 95-4. (Defs.' Stmt. Facts ¶ 43; Pls.' Stmt. Add'l Facts ¶ 7.) At his deposition, Gackowski testified that he and his training academy class visited the Cook County Jail and witnessed officers throw a handcuffed inmate face-first into a bench. (Pls.' Stmt. Add'l Facts ¶ 8; Defs.' Ex. 1, Gackowski Dep. at 131.) Gackowski further testified that while in training, a sergeant illustrated how to speed cuff inmates and that it was possible to shatter the inmate's bones in doing so. (*Id.* ¶ 15, Defs.' Ex. 1, Gackowski Dep. at 126.) According to

Gackowski, the sergeant then joked that the reporting officer would never know how the bones became shattered. (*Id.* ¶ 16, Defs.' Ex. 1, Gackowski Dep. at 126-27.) Further, Gackowski testified that a training sergeant told them after an Internal Affairs class that the IAD investigators were not their friends, but instead they were there to "trip up" the correctional officers. (*Id.* ¶ 25, Defs.' Ex. 1, Gackowski Dep. at 117-18.) The sergeant further explained to the cadets that they should be careful when they write their reports and that they should not "set each other out." (*Id.*)

Former correctional officer, Ricky Rodriguez, who started at the Training Academy in June of 1996, testified that:

> The code of silence is brought up to us and I believe it's brought up to us in the Redman training, that we are the officers, they are the inmates, we are the good guys, they are the bad guys. If you expect your fellow officers to back you up, you need to back them up, so basically what goes on in the jail stays in the jail.

(*Id.* ¶¶ 18, 19, Pls.' Ex. 33, Rodriguez Dep. at 211.)

## III. Division I Incidents

After their academy training, both Fairley and Gackowski worked in Division I of the Cook County Jail during part of the relevant time period and became friends. (Defs.' Stmt. Facts ¶¶ 21, 26, 35-38.) Fairley testified that while working in Division I in late 1998 or early 1999, he witnessed Defendant Coffey and another correctional officer hit two inmates. (Pls.' Stmt. Add'l Facts ¶ 46, Defs.' Ex. 8, Fairley Dep. at 507-09.) Fairley then told another officer to get a supervisor. (*Id.* ¶ 47, Defs.' Ex. 8, Fairley Dep. at 509-10.) After the incident, Fairley testified that he told a sergeant about it, after which Coffey called Fairley a snitch and threatened to beat him up. (*Id.* ¶¶ 48, 50, Defs.' Ex. 8, Fairley Dep. at 510-13.)

Gackowski testified that on April 1, 2000 he witnessed Coffey punch and kick inmate

Rodney Brown. (*Id.* ¶ 51, Defs.' Ex. 1, Gackowski Dep. at 295-96.) After Brown fell to the floor, Gackowski testified that Coffey continued to kick Brown. (*Id.*, Defs.' Ex. 1, Gackowski Dep. at 296.) According to Gackowski, he yelled at Coffey while Coffey was beating Brown and told Coffey not to include him as a witness in his report. (*Id.* ¶ 53, Defs.' Ex. 1, Gackowski Dep. at 286.) After the Brown incident, Gackowski testified that he told his supervising sergeant about the beating. (*Id.* ¶ 54, Defs.' Ex. 1, Gackowski Dep. at 296-97.) Coffey subsequently told Gackowski that he was not "part of the team." (*Id.* ¶ 57, Defs.' Ex. 1, Gackowski Dep. at 183.) Also after this April 2000 incident, Gackowski testified that Defendant Fermaint started calling him a snitch. (*Id.* ¶ 58, Pls.' Ex. 19, Gackowski Dep. at 207-08.) Similarly, Defendants Coffey, Fermaint, and Bercasio started calling Gackowski a "social worker." (*Id.* ¶ 59, Defs.' Ex. 1, Gackowski Dep. at 403-04.)

IV.     **The July 29, 2000 Incident**

Fairley testified at his deposition that on July 29, 2000 he saw Fermaint and another correctional officer abuse inmates, including Nathson Fields and James Scott, in the SI-2 (Special Incarceration Unit Two), which is the maximum security tier located in the basement of Division I. (Defs.' Stmt. Facts ¶¶ 64, 65; Pls.' Stmt. Add'l Facts ¶ 71.) Fairley testified that other officers, including Bercasio, also beat some inmates while they were handcuffed and shackled. (Pls.' Stmt. Add'l Facts ¶ 72; Defs.' Ex. 8, Fairley Dep. at 691, 922-23.) Further, Fairley stated that he told the officers to stop beating the inmates and subsequently reported the beating to his supervisors. (*Id*. ¶¶ 76, 93.) Also, Fairley testified that after the incident, Lieutenant Byrne told him not to write up a report and that IAD would interview him, yet no investigator from IAD ever interviewed Fairley in connection with the incident. (*Id*. ¶¶ 79, 80.)

Defendant Superintendent Andrews was also informed about the altercation in Division I on July 29, 2000. (*Id.* ¶ 81.) Furthermore, Fairley told Gackowski along with other correctional officers about the beating he had witnessed on July 29, 2000. (Pls.' Stmt. Add'l Facts ¶¶ 91, 98.)

Gackowski did not witness any of the events on July 29, 2000 in the SI-2 because he was assigned to Division VIII, which houses the Cermak Hospital Emergency Room. (*Id.* ¶ 82; Defs.' Stmt. Facts ¶¶ 66-70.) He nonetheless heard about the incident from officers in Division VIII. (Pls.' Stmt. Add'l Facts ¶ 83.) At the emergency room, Gackowski saw some of the injured officers and inmates, including inmate Scott, who were involved in SI-2 altercation. (*Id.* ¶ 84; Defs.' Stmt. Facts ¶¶ 72, 73.) Although Gackowski saw Scott very briefly, he testified at his deposition that Scott's face was swollen and that he was bleeding. (Pls' Stmt. Add'l Facts ¶ 85; Defs.' Stmt. Facts ¶¶ 71, 73.)

Gackowski was transferred back to Division I in August 2000. (*Id.* ¶ 86.) He testified at his deposition that on the day he returned to Division I, he talked to Byrne about the SI-2 incident and Byrne explained that some of the inmates had tried to jump the correctional officers. (*Id.* ¶ 87, Defs.' Ex. 1, Gackowski Dep., at 768-69; Defs.' Stmt. Facts ¶ 85.) The parties dispute whether Byrne told Gackowski that Byrne had tried to break one of the inmate's legs. (*Id.* ¶ 89.)

In August 2000 after the SI-2 incident, certain inmates filed a lawsuit in state court known as the "Fields Litigation," which named Lieutenant Byrne as one of the defendants. (*Id.* ¶¶ 104, 105.) The Fields Litigation received a significant amount of publicity in the Chicago area. (*Id.* ¶¶ 106-123.) In addition, correctional officers and other staff in Division I discussed the Fields Litigation. (*Id.* ¶¶ 91, 93, 94, 124.) In April 2001, a letter from the Sheriff's Office informed the Division I correctional officers about the Fields Litigation. (*Id.* ¶¶ 165-172.)

Superintendent Andrews discussed this letter with the correctional officers who received it, including Fermaint and Byrne. (*Id.* ¶¶ 169-171.) In the interim, Gackowski testified that he told correctional officer Rodriguez that he was going to tell the truth about the SI-2 incident. (*Id.* ¶ 97.) Similarly, Fairley told a number of correctional officers that he was not going to lie about the SI-2 incident. (*Id*. ¶ 103.)

Eventually, Fairley and Gackowski gave deposition testimony in the Fields Litigation. (*Id.* ¶ 401; Defs.' Stmt. Facts ¶ 101.) Prior to Fairley's testimony, a private investigator went to Fairley's residence, after which Fairley reported the investigator's visit to Superintendent Andrews. (*Id.* ¶¶ 147, 157.) After his conversation with Fairley, Andrews contacted IAD, the CCDOC's Executive Director's Office, and Sheriff Sheahan's Chief Legal Counsel to inform them that an investigator had been to Fairley's house. (*Id.* ¶ 161.)

## V. Alleged Harassment and Retaliation After the July 29, 2000 Incident

After the July 29, 2000 incident, Fairley testified that Fermaint refused to provide enough lunches and other supplies for the SI-2 inmates which caused the inmates to become irate and yell at Fairley. (*Id.* ¶¶ 252, 253.) Fairley also testified that Fermaint and Bercasio would "dry hump" him – meaning that they would physically grab him by the waist and imitate anal intercourse. (*Id.* ¶¶ 254, 256.) Moreover, Fairley testified that Fermaint and Bercasio also harassed him by failing to unlock the security door to the SI-2 Unit to allow Fairley to use the restroom, in addition to calling him an "inmate lover." (*Id.* ¶¶ 240, 251.) Evidence in the record also reveals that Byrne assigned Fairley difficult assignments and denied him paternity leave. (*Id.* ¶¶ 214, 216, 221, 224, 228.) According to Fairley, Defendant Loizon assigned him to the difficult task of escorting inmates to Cermak hospital at the end of his shift. (*Id*. ¶ 222, Defs.'

Ex. 8, Fairley Dep. at 847-48.)

Further, Bercasio drew sexually explicit cartoons of Gackowski and had them posted around Division I. (*Id.* ¶¶ 257, 258; Defs.' Stmt. Facts ¶ 121.) Gackowski also testified that from late 2000 through May or June 2002, Bercasio and Fermaint "dry humped" him by physically grabbing him and imitating anal intercourse. (Pls.' Stmt. Add'l Facts ¶ 262; Defs.' Stmt. Facts ¶ 121.) The record contains undisputed evidence that Gackowski reported the correctional officers' harassment to Byrne. (Defs.' Stmt. Facts ¶ 112.)

## VI.     Gackowski's Complaint to Internal Affairs

On June 14, 2002, Gackowski told Superintendent Andrews that he might file a complaint with Internal Affairs concerning the officers' harassment. (Defs.' Stmt. Facts. ¶ 116.) Gackowski also testified that on June 15, 2002, he told Lieutenant Byrne that he was going over Superintendent Andrews' head and would report the various officers' harassing conduct to Internal Affairs. (*Id.* ¶¶ 91, 117; Pls.' Stmt. Add'l Facts ¶¶ 264, 269.) Gackowski testified at his deposition that Byrne told him that if he did go to Internal Affairs, repercussions would follow. (Pls.' Stmt. Add'l Facts ¶ 266.) Moreover, Gackowski stated that he informed other Defendants that he was going to go to Internal Affairs with his complaints. (*Id.* ¶¶ 267, 268.) Also, in or about June or July 2002, Gackowski, by giving an investigation statement, told Defendant Gregory Ernst of Internal Affairs that certain officers were harassing him. (*Id.* ¶ 270; Defs.' Ex. 20, Gackowski's 2002 Internal Affairs Stmt.)

On July 9, 2002, Gackowski submitted a written complaint to Internal Affairs alleging that he was the subject of harassment by other correctional officers. (*Id.* ¶ 272; Defs.' Stmt. Facts ¶ 119.) Saul Weinstein, the Chief Investigator of IAD, did not initiate an investigation into

Gackowski's allegations, but instead forwarded Gackowski's complaint back to Division I and Superintendent Andrews. (Pls.' Stmt. Add'l Facts ¶ 274.) Gackowski testified that when he went to Andrews' office, Andrews berated him for submitting the IAD complaint. (*Id.* ¶ 280.) In addition, Andrews told Gackowski that he would sue Gackowski for slander because of the statements Gackowski made in the IAD complaint. (R. 454-1, Def. Andrews Rule 56.1(a)(3) Stmt. Facts ¶ 11.) Nevertheless, Andrews contacted Weinstein and told him that he was sending Gackowski's complaint back to IAD because it was a "conflict of interest" for Andrews to investigate a complaint in which he was a named subject. (Pls.' Stmt Add'l Facts ¶ 282.)

After Gackowski's complaint was returned to IAD, Investigator Gregory Ernst was assigned to the case and interviewed Gackowski about his allegations. (*Id.* ¶¶ 303, 304.) In his statement to Ernst, Gackowski identified officers who had harassed him, including Fermaint and Bercasio, and described the harassment – including physical grabbing, sexually suggestive cartoons, and degrading and sexual comments about his wife. (*Id.* ¶ 305, Defs.' Ex. 20, Gackowski's 2002 Internal Affairs Stmt.) Gackowski told Ernst that he believed he had been singled out for harassment because he did not "smack inmates around for no reason." (*Id*. ¶ 306.) Further, Gackowski explained to Ernst that he had witnessed Fermaint, Byrne, and Coffey abuse inmates and specifically described the Rodney Brown incident. (*Id.* ¶¶ 308, 314.) There is also evidence in the record that other correctional officers knew that Gackowski had made a report to the IAD, especially because a Division I Chief spoke to everyone identified in Gackowski's IAD complaint. (*Id.* ¶¶ 291, 316, 321-326.)

On September 20, 2002, Ernst reported to the Chief of IAD, Saul Weinstein, that Gackowski had filed a complaint with the Illinois Human Rights Department and Weinstein

advised Ernst to put the investigation into Gackowski's IAD complaint on hold until the completion of the Human Rights investigation. (*Id.* ¶¶ 327, 328.) Gackowski contends that no one ever told him that his IAD investigation was put on hold. (*Id*. ¶ 335.)

## VII. Lipscomb Incident

On December 20, 2002, there was an altercation between inmate Keon Lipscomb and Fairley, as well as other correctional officers. (Defs.' Stmt. Facts ¶ 214.) On that date, Fairley was scheduled to transport Lipscomb for his "medical movement." (Pls.' Stmt. Add'l Facts ¶¶ 337-339; Defs.' Stmt Facts ¶ 216.) After Lipscomb's "medical movement" was cancelled, Lipscomb would not follow Fairley's orders. (Pls.' Stmt. Add'l Facts ¶ 342; Defs.' Stmt Facts ¶ 220.) Thereafter, Bercasio, Byrne, and Loizon came to Fairley's assistance. (Defs.' Stmt. Facts ¶ 223.) Lipscomb attacked Fairley, Bercasio tackled Lipscomb from behind, and Fairley fell back during which Fairley sustained a cut to his wrist. (Pls.' Stmt. Add'l Facts ¶¶ 348, 349.) After that, other correctional officers helped subdue Lipscomb. (*Id.* ¶ 350.)

Thereafter, the Sheriff's Office Investigator, Timothy Kaufmann, began his investigation of the Lipscomb incident. (*Id.* ¶ 361; Defs.' Stmt. Facts ¶ 233.) Kaufmann interviewed Fairley as well as other the officers involved. (Defs.' Stmt. Facts ¶ 237.) An Assistant States Attorney, Bumjoon Park, also conducted a felony review into the Lipscomb incident and interviewed Fairley and the officers. (*Id.* ¶¶ 238, 240, 246.) In the course of the investigation, Fairley told Kaufmann and Park that he believed he was being set up in retaliation for speaking the truth about the July 29, 2000 incident and his upcoming testimony in the Fields Litigation. (Pls.' Stmt. Add'l Facts ¶ 364, Pls.' Ex. 25, Kaufman Dep. at 51, Pls.' Ex. 30, Park Dep. at 69.) Kaufmann's final report of the Lipscomb incident stated that he and Assistant States Attorney

Park concluded that charges against Lipscomb were not warranted because of Fairley's inconsistent statements. (*Id.* ¶ 367.) Park, however, testified at his deposition that he did not tell Kaufmann that the States Attorney's Office would not approve felony charges or that he found Fairley to be incredible. (*Id.* ¶¶ 368, 369, Pls.' Ex. 30, Park Dep. at 27, 63-64.) The States Attorney's Office never brought criminal charges against Lipscomb regarding his assault on Fairley. (*Id.* ¶ 375; Defs.' Stmt. Facts ¶ 253.)

## VIII. Prohaska Threat

Shortly after the Lipscomb incident, Gackowski testified that he encountered Defendant Prohaska in Division I, after which Prohaska asked Gackowski about Fairley's testimony in the Fields Litigation. (Pls.' Stmt. Add'l Facts ¶¶ 382-384.) During their encounter, Gackowski asserts that Prohaska stated that Fairley was a weak link and that they had to "bury" the weak link. (*Id.* ¶ 384.) Also, Gackowski asserts that Prohaska made disparaging remarks about him. (*Id.* ¶ 385.) On January 9, 2003, Gackowski filed a IAD complaint regarding the Prohaska threat. (Defs.' Stmt. Facts ¶ 168.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of

material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, the Court construes the facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255. The existence of a factual dispute alone is not sufficient to defeat a summary judgment motion, instead the non-moving party must present definite, competent evidence to rebut the summary judgment motion. *Butts v. Aurora Health Care, Inc.,* 387 F.3d 921, 924 (7th Cir. 2004).

## ANALYSIS

### I. First Amendment Retaliation Claim – Count I

The First Amendment protects freedom of speech and expressive conduct and generally prevents the government from proscribing such activities. *RAV v. City of St. Paul, Minnesota,* 505 U.S. 377, 382, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992). "It is by now well established that the government may not arbitrarily silence the constitutionally-protected speech of its employees. Government workers do not forfeit their First Amendment rights simply by accepting public sector employment." *Wernsing v. Thompson,* 423 F.3d 732, 750 (7th Cir. 2005). Although public sector employees retain their First Amendment rights to free speech, a public employee does not possess unlimited rights of speech and expression on matters related to official responsibilities. *Sullivan v. Ramirez,* 360 F.3d 692, 697 (7th Cir. 2004) (citing *Pickering v. Board of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)); *see also Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (employee's speech may be protected if matter of public concern).

In determining a Section 1983 claim for retaliation in violation of a public employee's

12

First Amendment rights, the Court conducts a three-step inquiry: (1) the Court first determines whether the employee's speech was constitutionally protected under the *Connick-Pickering* test; (2) Plaintiffs then must show that their speech was a substantial or motivating factor in the retaliation; and (3) Defendants may rebut Plaintiffs' contentions by establishing that Defendants would have taken the same action in the absence of Plaintiffs' protected speech. *Ashman v. Barrows*, 438 F.3d 781, 784 (7th Cir. 2006); *Sullivan v. Ramirez,* 360 F.3d at 697-98. Plaintiffs have the burden of establishing the first two prongs because they constitute the prima facie elements of a First Amendment retaliation claim. *Carreon v. Illinois Dep't of Human Servs.*, 395 F.3d 786, 791 (7th Cir. 2005). "If the plaintiff establishes these elements, the burden shifts to the defendant to prove by a preponderance of the evidence that it would have taken the same action in the absence of the protected speech." *Id.*

## A.    Connick-Pickering Test

Defendants do not address whether Gackowski's and Fairley's speech was a matter of public concern under *Connick*, nor do they discuss the balancing test as required under *Pickering*. Because the *Connick-Pickering* test is a prima facie element of Plaintiffs' retaliation claim, the Court addresses this first step for the sake of completeness.

### 1.    Matter of Public Concern

Under *Connick*, the Court must determine whether each Plaintiff spoke "as a citizen upon matters of public concern." *Connick,* 461 U.S. at 147. To do so, the Court examines "the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147-48. The *Connick* public concern element must relate to a community concern, and thus cannot relate to an employee's personal grievance. *Carreon,* 395 F.3d at 791; *see also Cygan v. Wisconsin*

13

*Dep't of Corr.,* 388 F.3d 1092, 1099 (7th Cir. 2004) (speech must be matter of political, social, or other community concern ).

Looking to the content, form, and context of Plaintiffs' speech, it involved other correctional officers physically abusing inmates at the Cook County Jail.  Plaintiffs' speech took the form of complaints and statements to other correctional officers, supervisors, and investigators about this alleged excessive force, as well as their testimony in the Fields Litigation.  Such speech is not a mere personal concern, but pertains to a social and public concern as required under *Connick*.  *See Glass v. Dachel,* 2 F.3d 733, 741 (7th Cir. 1993) ("speech that focuses on police departments (and ultimately police protection and public safety) involve matters of great public concern"); *see also Kinney v. Weaver,* 367 F.3d 337, 356 (5th Cir. 2004) (en banc) ("plaintiff's testimony regarding the use of excessive force by police officers was unquestionably a matter of public concern").

### 2.    Balancing Interests

Under the *Pickering* prong, the Court balances the interests of the employee "as a citizen, in commenting upon matters of public concern" against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Pickering,* 391 U.S. at 568.  In other words, governmental units may restrict a public employee's speech if the government can show that its interest in promoting effective and efficient public service outweighs the employee's interest as a citizen commenting on matters of public concern. *Carreon*, 395 F.3d at 791(citing *Gustafson v. Jones,* 290 F.3d 895, 909 (7th Cir. 2002)).

 Although an employer's concern regarding the disruptive nature of an employee's speech is important in the context of law enforcement, when an employee reports illegal conduct,

such speech is necessarily protected. *See McGreal v. Ostrov,* 368 F.3d 657, 678 (7th Cir. 2004) (citation omitted). Therefore, the CCDOC's need to perform efficient public service does not outweigh Plaintiffs' interests as citizens commenting on inmate abuse and the alleged excessive force at the Cook County Jail. *See Carreon,* 395 F.3d at 791.

**B.** **Substantial or Motivating Factor**

The next element of Plaintiffs' prima facie case is whether Plaintiffs' protected speech was a substantial or motivating factor in the alleged retaliation and harassment. *See Ashman v. Barrows*, 438 F.3d at 784; *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). The "motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions." *Spiegla v. Hull,* 371 F.3d 928, 942 (7th Cir. 2004).

Defendants contend that their conduct was not a motivating factor in the retaliation and harassment because they did not know of Plaintiffs' protected speech in the first instance. Defendants base their argument on *Stagman v. Ryan,* 176 F.3d 986, 999 (7th Cir. 1999), in which the Seventh Circuit concluded that to establish the "motivating factor" element, plaintiffs must demonstrate that defendants knew of plaintiff's constitutional activities. In *Stagman,* the Seventh Circuit concluded that the plaintiff had failed to raise a genuine issue of material fact regarding whether his supervisor knew of his constitutionally protected union activities. *See id.* The Court thus turns to whether the individual Defendants knew of Plaintiffs' constitutional activities.

###### 1.      Correctional Officers and Supervisors[2]

Defendants Fermaint, Bercasio, Prohaska, Coffey, Loizon, Byrne, and Andrews argue

that they were unaware of Plaintiffs' constitutional activities, namely, that Plaintiffs engaged in

protected speech. Plaintiffs' protected speech involved speaking out against inmate abuse and

excessive force at the Cook County Jail. As Judge Castillo explained in denying Defendants'

qualified immunity claim, a "reasonable person in Defendants' position would have known that

retaliating and harassing someone because of something they said or wanted to say was

unconstitutional." *Fairley v. Andrews,* 300 F.Supp.2d 660, 668-69 (N.D. Ill. 2006).[3]

Despite Defendants' argument, Plaintiffs have set forth competent evidence establishing

a genuine issue of material fact that they openly spoke out against the inmate abuse and

---

[2] Defendants Fermaint, Bercasio, Prohaska, Coffey, and Loizon contend that they cannot be found liable on Plaintiffs' First Amendment retaliation claim because only supervisors can take adverse employment actions. Further, Superintendent Andrews argues that he took no actions against Plaintiffs that can be considered adverse employment actions. Defendants' arguments are without merit because Section 1983 lawsuits do not require an adverse employment action within the meaning of the anti-discrimination statutes, such as Title VII. *Spiegla v. Hull,* 371 F.3d 928, 941 (7th Cir. 2004). Instead, any deprivation that is likely to deter the exercise of free speech is actionable. *Id.*; *see also DeGuiseppe v. Village of Bellwood,* 68 F.3d 187, 192 (7th Cir. 1995) ("Under the law of this Circuit, retaliation need not be monstrous to be actionable under the First Amendment; it need merely create the potential for chilling employee speech on matters of public concern.").

[3] Judge Castillo already ruled that Defendants did not establish qualified immunity because Plaintiffs' right to free speech under the circumstances was clearly established. *Fairley v. Andrews,* 300 F.Supp.2d 660, 668-69 (N. D. Ill. 2006) (citing *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). Because this ruling is the law of the case, the Court will not reopen this issue unless the decision is "clearly erroneous and would work a manifest injustice." *Moriarty v. Svec,* 429 F.3d 710, 722-23 (7th Cir. 2005) (citation omitted). Defendants fail to give any compelling reasons for the Court to conclude that this previous ruling was clearly erroneous and would result in a manifest injustice, thus the Court will not revisit Judge Castillo's ruling.

excessive force at the Cook County Jail, especially concerning the SI-2 incident that resulted in the Fields Litigation, and that these Defendants were aware of this protected speech. Fairley testified that he told Fermant and Bercasio to stop beating inmates during the SI-2 incident and that he told many of his fellow correctional officers about this incident. Plaintiffs also testified that they told other correctional officers they would not lie about the SI-2 incident.

Evidence also exists that other correctional officers and supervisors were put on notice of Plaintiffs' protected speech and the SI-2 incident. For example, in April 2001, the Sheriff's Office sent a letter to Division I correctional officers about the Fields Litigation and Superintendent Andrews discussed this letter with the correctional officers who received it, including Fermant and Byrne. Also, Fairley testified that after the SI-2 incident, Lieutenant Byrne told him not to write up a report and that IAD would interview him, yet no investigator from IAD ever interviewed Fairley in connection with the incident. Furthermore, Gackowski testified that Byrne told him about his actual involvement in the SI-2 incident.

As far as Gackowski's IAD complaint, Gackowski told Superintendent Andrews that he might file a complaint with Internal Affairs concerning the officers' harassment and told Lieutenant Byrne that he was going over Superintendent Andrews' head and would report the various officers' harassing conduct to Internal Affairs. Thereafter, Byrne told Gackowski that if he went to Internal Affairs, repercussions would follow. The record also reveals that other correctional officers knew of Gackowski's IAD compliant, especially because a Division I Chief spoke to everyone identified in Gackowski's IAD complaint that included Byrne, Fermaint, Bercasio and Coffey.

Similarly, there is competent, definite evidence that the CCDOC Defendants retaliated or

harassed Plaintiffs after Plaintiffs engaged in protected speech, including evidence that Gackowski told Byrne and Andrews that he was reporting officer harassment to IAD in 2002 and Andrews subsequently berated and threatened to sue Gackowski about statements made in this IAD report.  In addition, Fairley testified that Byrne told him not to fill out a report about the SI-2 incident, and thereafter assigned Fairley difficult tasks and refused his request for paternity leave.  Also, Plaintiffs have presented evidence that in reference to the Fields Litigation, Prohaska threatened Fairley and Gackowski by saying that they needed to "bury" the weak link.

Moreover, Fairley testified that after he witnessed Coffey hit two inmates in late 1998 or early 1999 and reported the incident to a sergeant, Coffey started calling him a snitch and threatening to beat him up.  Gackowski testified that after he witnessed Coffey punch and kick inmate Rodney Brown and asked Coffey to stop, he later reported the incident to the supervising sergeant.  After the Brown incident, Coffey told Gackowski that he was not part of the team and Fermaint started calling him a snitch.  Further, Coffey, Fermaint, and Bercasio mocked Gackowski by calling him a "social worker," and Fermaint and Bercasio "dry-humped" both Gackowski and Fairley on several occasions after these incidents.

Construing this evidence and all reasonable inferences in a light most favorable to Plaintiffs – as the Court must do at this procedural posture – there is a genuine issue of material fact that Fermaint, Bercasio, Prohaska, Coffey, Byrne, and Andrews knew of Plaintiffs' constitutional activities –  namely, their speech against inmate abuse and excessive force at the Cook County Jail –  and thereafter either retaliated or harassed Plaintiffs.

Meanwhile, although Plaintiffs identify evidence that Sergeant Loizon assigned Fairley

18

undesirable tasks, Plaintiffs fail to point to any specific evidence that Sergeant Loizon knew of Plaintiffs' protected speech. In fact, in their legal memorandum, Plaintiffs do not argue that it is reasonable to conclude that Loizon knew about the Fields Litigation. (*See* R. 553-2, Pls.' Corrected Resp. at 39.) Accordingly, without more definite, competent evidence to rebut Loizon's summary judgment motion, Plaintiffs' claim against Loizon must fail. *See Butts,* 387 F.3d at 924; *see also* Fed. R. Civ. P. 56(e) (adverse party must set forth specific facts showing that there is genuine issue for trial). The Court grants Loizon's Motion for Summary Judgment as to Count I.

Finally, the Court rejects the correctional officers' argument that their conduct was not under the "color of state law" for purposes of Section 1983 liability. Judge Castillo's prior ruling on Defendants' motion to dismiss rejected this precise argument, *see Fairley v. Andrews*, 300 F.Supp.2d 660, 665-66 (N.D. Ill. 2006), and Defendants provide no basis to revisit it. *See Moriarty v. Svec,* 429 F.3d 710, 722-23 (7th Cir. 2005) (courts will not reopen already decided issues unless decision is "clearly erroneous and would work a manifest injustice"); *see also Power v. Summers,* 226 F.3d 815, 820 (7th Cir. 2000) ("Any deprivation under color of law that is likely to deter the exercise of free speech, whether by an employee or anyone else, is actionable").

### 2. IAD and Sheriff's Office Investigators

#### a. Timothy Kaufmann[4]

Fairley's First Amendment claim against Sheriff's Office Investigator Timothy

---

[4] Because there is no evidence that Defendant Kaufmann harassed Gackowski, Gackowski voluntarily dismisses Kaufmann from Count I.

Kaufmann is premised on Kaufmann's investigation into the Lipscomb assault. More specifically, Fairley contends that his protected speech concerning the SI-2 incident was a motivating factor behind Kaufmann's retaliation of falsifying the Lipscomb investigation report. Fairley supports his argument with evidence that Kaufmann falsely stated in his final report that the Assistant States Attorney informed Kaufmann that he would not pursue felony charges against Lipscomb based on Fairley's inconsistent statements. (*See* Defs.' Stmt. Facts ¶ 302.) Construing the facts and all reasonable inferences in a light most favorable to Fairley, Fairley has presented competent evidence in the form of Kaufmann's and Park's deposition testimony that Fairley informed them of his suspicion that he was being retaliated against for the July 29, 2000 incident. Fairley also has presented Assistant States Attorney Park's deposition testimony in which Parks denied that he said that the States Attorney would not bring charges against Lipscomb based on Fairley's inconsistent statements. This evidence creates a genuine issue of material fact that Fairley's protected speech about the SI-2 incident was a motivating factor behind Kaufmann falsifying the Lipscomb report. *See Spiegla v. Hull,* 371 F.3d at 942. Finally, Kaufmann's argument that Fairley does not have a constitutional right to a police investigation into the Lipscomb assault does not save the day because Fairley's present constitutional claim is based on his protected speech under the First Amendment and not Kaufmann's failure to properly perform a police investigation.

### b.     Saul Weinstein[5]

Next, Gackowski contends that his protected speech was a motivating factor behind

---

[5]  Because there is no evidence in the record that Defendant Weinstein harassed Fairley, Fairley voluntarily dismisses Defendant Weinstein from Count I.

Weinstein's retaliation, specifically, Weinstein's alleged efforts to hinder the investigation into Gackowski's IAD complaint. Gackowski claims that there was no reason for Weinstein to put his IAD complaint on hold pending the Illinois Human Rights Department's investigation into his sexual harassment complaint. In support, Gackowski points to evidence that Weinstein sent his IAD complaint back to Andrews even though Andrews was one of the subjects of the complaint. Gackowski also presents competent evidence that Andrews berated him and threatened to sue him after Weinstein returned the IAD complaint to him. Finally, Weinstein's argument that he was not aware of Gackowski's constitutionally protected speech is rebutted by the fact that Weinstein received and reviewed Gackowski's IAD complaint which included such information. As such, viewing the evidence in favor of Gackowski, there is a genuine issue of material fact that Gackowski's protected speech was a motivating factor behind Weinstein's delaying the IAD investigation and Weinstein's returning the IAD complaint to Andrews. Accordingly, the Court denies Weinstein's Motion for Summary Judgment as to Count I of the Second Amended Complaint.

### c. Gregory Ernst

Last, Plaintiffs fail to develop their conclusory allegation that their protected speech was a motivating factor in Internal Affairs Investigator Ernst's harassment or retaliation. Specifically, Plaintiffs argue that Ernst did not protect them after they reported inmate abuse and the resultant harassment, but instead lied, intimidated Gackowski, and generally hindered Plaintiffs' efforts to speak out. Plaintiffs, however, do not point to facts in the record supporting these allegations. Further, Plaintiffs argue that Ernst falsely reported to Weinstein that Gackowski filed a harassment complaint with the Illinois Human Rights Department, but in fact,

Gackowski did file such a complaint and also a charge of discrimination with the EEOC. (Pls.' Stmt. Add'l Facts ¶¶ 327-30; Defs.' Stmt. Facts ¶ 159.) Simply put, Plaintiffs do not point to definite, competent evidence supporting their argument that their protected speech was the motivating factor behind Ernst's alleged retaliation. *See Butts,* 387 F.3d at 924; *see also Corley v. Rosewood Care Center, Inc. of Peoria,* 388 F.3d 990, 1001 (7th Cir. 2004) (court will not root through thousands of pages of record to make case for plaintiffs). Considering the evidence and all reasonable inferences in a light most favorable to Plaintiffs, they have not established a genuine issue of material fact as to their claim against Ernst. Therefore, the Court grants Ernst's Motion for Summary Judgment as to Count I.

### C. Defendants' Rebuttal

In their initial briefs, Defendants do not argue that they would have taken the same action in the absence of Plaintiffs' protected speech, and thus Defendants have waived this argument for purposes of their summary judgment motions.[6] *See Doherty v. City of Chicago,* 75 F.3d 318, 324 (7th Cir. 1996) ("Given our adversary system of litigation, it is not the role of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.") (citation omitted); *see also Estate of Moreland v. Dieter,* 395 F.3d 747, 759 (7th Cir. 2005) ("Perfunctory or undeveloped arguments are waived.").

Because Plaintiffs' speech is protected under the *Connick-Pickering* test and Plaintiffs

---

[6] In his reply brief, Weinstein contends that he would have acted identically in the absence of Gackowski's protected speech, although Weinstein does not address the issue of returning the IAD complaint to Andrews, a named subject in Gackowski's complaint. In any event, arguments raised for the first time in a parties' reply brief are waived because the non-movant has had no opportunity to respond. *See Kelso v. Bayer Corp.,* 398 F.3d 640, 643 (7th Cir. 2005).

have presented competent, specific evidence creating a genuine issue of fact regarding their speech being the motivating factor in the alleged retaliation and harassment, the Court denies Andrews', Byrne's, Coffey's, Prohaska's, Bercasio's, Fermaint's, Weinstein's, and Kaufmann's Summary Judgment Motions as to Count I of the Second Amended Complaint. The Court grants Loizon's and Ernst's Motions for Summary Judgment as to Count I.

## II.    Plaintiffs' Monell Claim Against Sheriff Sheahan

Plaintiffs contend that the "code of silence" at the CCDOC is a deeply ingrained, unwritten mandate that CCDOC correctional officers do not report other employees' misconduct, especially concerning allegations of excessive force and inmate abuse. As such, Plaintiffs assert that violators of the code of silence are subject to harassment and intimidation ranging from name calling to physical threats. Based on the code of silence, Plaintiffs contend that Sheriff Sheahan, in his official capacity, is liable for their constitutional injuries.[7]

To establish liability against Sheriff Sheahan in his official capacity under 42 U.S.C. § 1983, Plaintiffs must show that (1) they suffered a deprivation of a federal right,[8] (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker

---

[7]    Plaintiffs' First Amendment claims against the individual Defendants in their official capacities are actually claims against the Sheriff's Office as a local governmental unit. *See Kentucky v. Graham*, 473 U.S. 159, 165-66, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114, 121 (1985) (citing *Monell v. Dept. of Soc. Servs. of New York*, 436 U.S. 658, 690, n.55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). In other words, official capacity suits brought against individuals are "another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. at 165 (citation omitted). Accordingly, Sheriff Sheahan is the only proper Defendant in Plaintiffs' *Monell* claim.

[8]    Sheriff Sheahan makes no arguments as to whether Plaintiffs suffered a deprivation of a federal right. The Sheriff has therefore waived any such argument. *Estate of Moreland v. Dieter,* 395 F.3d 747, 759 (7th Cir. 2005) ("Perfunctory or undeveloped arguments are waived.").

with final policy-making authority, which (3) proximately caused their constitutional injuries. *Ovadal v. City of Madison,* 416 F.3d 531, 535 (7th Cir. 2005). Under the second requirement, Plaintiffs must establish that an official custom or policy caused the deprivation of their constitutional rights. *Monell v. Dept. of Soc. Servs. of New York*, 436 U.S. 658, 690-91 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To show that an official custom or policy caused the violation of such rights, Plaintiffs must establish one of the following scenarios: (1) there was an express policy that, when enforced, causes a constitutional deprivation; (2) there was a widespread practice that, although not authorized by written law or express policy, is so permanent and well-settled that it constitutes custom or usage within the force of law; or (3) a person with final policymaking authority caused the constitutional injury. *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005).

### A.      Widespread Practice

Plaintiffs contend that the code of silence was so permanent and well-established that it constituted custom or usage within the force of law under the second *Monell* prong. Because Plaintiffs bear the burden of proving the code of silence at trial, Plaintiffs must set forth specific facts showing that there is a genuine issue of material fact regarding the existence of the code of silence. *See Palmer v. Marion County*, 327 F.3d 588, 595 (7th Cir. 2003) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "When a plaintiff chooses to challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference." *Palmer,* 327 F.3d at 595-96 (citing *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)). Thus, under the *Monell*

widespread practice theory, Plaintiffs must establish an unconstitutional pattern of conduct, including incidents other than ones involving them, to give rise to the inference that an unconstitutional custom, policy, or practice exists. *See Tabor v. City of Chicago,* 10 F.Supp.2d 988, 993 (N.D. Ill. 1998); *see also Palmer,* 327 F.3d at 595-96 (plaintiff failed to set forth sufficient proof of widespread practice based on failure to present evidence other than incident in which he was involved).

Here, Plaintiffs assert that "[t]here is overwhelming evidence to support the inference of a widespread custom of concealing mistreatment of prisoners and harassing officers who are perceived to be or who actually refuse to participate in the concealment of the mistreatment of prisoners." (R. 549-1, Pls.' Resp. to Sheahan's Mot. Summ. J. at 1.) Sheahan, on the other hand, contends that Plaintiffs have not set forth facts establishing that the correctional officers subjected other CCDOC employees to harassment or retaliation pursuant to the code of silence.

Besides Plaintiffs' evidence concerning their own experiences with the code of silence, Plaintiffs have also produced specific, competent evidence establishing a genuine issue of material fact regarding the existence of the code of silence as applied to other correctional officers. Plaintiffs, for example, present the deposition testimony of Charles Holman, who was an Investigator in the Internal Affairs Department from 1993 to 2003. (Pls.' Stmt. Add'l Facts ¶ 423). The pertinent part of Holman's deposition states:

Q: Are you aware of any officers who have filed claims of harassment with IAD where they're claiming that they were harassed for reporting other officers?

A: Yes.

Q: What officers?

A: I've done over 400 investigations. I can't think of everybody's name. But it's

25

> a common occurrence. When you have witnesses that go against the grain and testify truthfully in these statements and in their investigations, they're routinely harassed by supervisors, by other officers.

(Pls.' Stmt. Add'l Facts ¶¶ 423, 424, Pls.' Ex. 22, Holman Dep. at 461-62.) Holman then remembered that he personally investigated a specific incidence and individual who experienced such harassment and gives an explanation of the situation. (*Id*., Pls.' Ex. 22, Holman Dep. at 462-65.) Although Defendants assert that Holman's testimony amounts to inadmissible hearsay, speculation, and opinion, and argues that it lacks a proper foundation, Defendants fail to explain why Holman's testimony is such. Nevertheless, although hearsay is inadmissible at summary judgment as well as trial, *see Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir. 1997), Holman's testimony is based on his own personal knowledge of incidents that he investigated, as well as his ten years working as an IAD investigator. *See* Fed.R.Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); *see also United States v. Joy,* 192 F.3d 761, 767 (7th Cir. 1999) ("Because most knowledge is inferential, personal knowledge includes opinions and inferences grounded in observations or other first-hand experiences."). While the individuals' comments to Holman during the course of his investigations may not be admissible for the truth of the matter, Holman's investigative activity and lay person opinions based on such activity would be admissible. Therefore, Defendants' evidentiary objections fail.

Plaintiffs also present deposition testimony of a former correctional officer, Ricky Rodriguez, who worked in Division I from 1998 to 2003. (Pls.' Stmt. Add'l Facts ¶ 41.) Rodriguez's deposition testimony states in relevant part:

> Q: Have you ever reported any instance of an officer using excessive force on an inmate?

A:  No, I haven't.

Q:  Why not, if you witnessed it?

A:  One of the things that they teach us is that we as officers, we are the men in blue, the officers in blue, and the inmates are in brown.  We have to stick with our own kind.  Basically you can't go against us because they are going to go against you anyway, so there is that kind of like code of silence.

Q:  Who taught you this kind of code of silence that you just testified to?

A:  This code of silence, it's taught in the Academy.

Q:  I thought when we went through the general orders, the general orders provide that if you see a correctional officer using excessive force on an inmate, you are ethically obligated to report it.  Do you recall reviewing a general order providing that?[9]

A:  Yes, I did.

Q:  Do you recall you testifying you abided by the general orders when you were a correctional officer?

A:  I said that.  But if any officer within the jail sees a beating, nobody is going to tell about it, or if not a beating, they will witness an inmate getting slapped, sucker punched, even while he is cuffed and shackled.  It may not be an aggressive beating.  Everybody witnesses and nobody talks about it.

(*Id.,* Pls.' Ex. 33, Rodriguez Dep., at 208-09.)

Despite Defendants' arguments to the contrary, Rodriguez's comments are based on his own personal experience at the CCDOC Training Academy and as a correctional officer at the CCDOC.  *See* Fed.R.Evid. 602; *see also United States v. Joy,* 192 F.3d at 767.  As the Seventh

---

[9]  Sheriff Sheahan argues that the CCDOC General Orders' requirement that all correctional officers must report other officers' misconduct refutes Plaintiffs' argument that the code of silence existed.  The Sheriff's argument is baseless because courts look to a governmental unit's actual practice, as opposed to its written policy, when determining whether a widespread practice exists under the second *Monell* scenario.  *See Woodward v. Correctional Med. Serv.,* 368 F.3d 917, 927 (7th Cir. 2004).

Circuit has explained "inferences reached from a witness's observations need not reach the level of absolute certainty to be admissible. Rather, the key question for the trial court is whether a reasonable trier of fact could believe that a witness had personal knowledge of the facts about which he testified." *Joy,* 192 F.3d at 767 (internal citation omitted).

Meanwhile, Plaintiffs have set forth competent evidence of additional incidences to support their theory that the widespread practice of the code of silence existed, including Sergeant Arthur Perry reporting a separate incident of inmate abuse and the resultant harassment. (Pls.' Stmt. Add'l Facts ¶¶ 126-129, 135, 138; Defs. Stmt. Facts ¶¶ 294-96.) The Court need not discuss the details of these additional instances because considering the facts and all reasonable inferences in Plaintiffs' favor, Rodriguez's and Holman's testimony sufficiently establishes that there is a genuine issue of material fact for trial concerning the existence of the code of silence. *See Palmer*, 327 F.3d at 595.

### B.     Force of Law

Next, the Court must determine whether the code of silence had the "force of law." There are two routes Plaintiffs may take to establish that the code of silence has the force of law. *See Woodward v. Correctional Med. Serv.*, 368 F.3d 917, 927 (7th Cir. 2004); *Gable v. City of Chicago*, 296 F.3d 531, 538 n.3 (7th Cir. 2002). First, municipal customs have the force of law if the custom itself is unconstitutional. *Woodward,* 368 F.3d at 927; *Gable*, 296 F.3d at 538 n.3. Second, Plaintiffs may indirectly establish that the custom or policy has the force of law "by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of

subordinate officers." *Woodward,* 368 F.3d at 927 (citing *Estate of Novack ex rel. v. County of Wood,* 226 F.3d 525, 530 (7th Cir. 2000) (citation omitted)).

Plaintiffs choose the second route, and therefore, must establish that Sheriff Sheahan was deliberately indifferent to the fact that the code of silence's known or obvious consequences would result in the deprivation of a constitutional right. *Gable,* 296 F.3d at 537-38 (citing *Board of County Comm'rs v. Brown*, 520 U.S. 397, 406-07, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)); *see also City of Canton v. Harris,* 489 U.S. 378, 38-89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). In other words, this "culpability" standard requires a showing of the Sheriff's conscious disregard of the policy's known or obvious dangers. *Armstrong v. Squadrito,* 152 F.3d 564, 577 (7th Cir. 1998); *West v. Waymire,* 114 F.3d 646, 651 (7th Cir. 1997). In *Waymire*, the Seventh Circuit explained that "a deliberate choice to avoid an obvious danger ... is actionable under 42 U.S.C. § 1983 if the choice results in harm to a protected interest, even though the defendant obtusely lacks actual knowledge of the danger." *Id.* at 651. Thus, Plaintiffs need not show that Sheriff Sheahan had actual knowledge of the danger concerning the code of silence to establish their claim under *Monell. See id.*

In support of their argument that Sheriff Sheahan was deliberately indifferent to the fact that the code of silence's known or obvious consequences would result in the deprivation of a constitutional right, Plaintiffs have presented evidence concerning the inadequacy of the reporting mechanisms within CCDOC. First, they have presented evidence creating a genuine issue of material fact that Sheriff Sheahan did not properly supervise investigations of officer misconduct. Plaintiffs base their argument on Sheriff Sheahan's deposition testimony that he

never reviewed IAD investigations as required under General Order 4.1. (Pls.' Stmt. Add'l Facts ¶¶ 449, 450.) Under General Order 4.1, the IAD is under the direction of the Sheriff of Cook County. (*Id.* ¶ 443.) Also pursuant to this General Order, after an investigator conducts an independent investigation and "sustains" the allegations, IAD sends the Sheriff copies of the investigation. (*Id.* ¶¶ 444-46.) Despite General Order 4.1, Sheriff Sheahan testified at his deposition that he has never received any reports of excessive force allegations or written reports from IAD containing information regarding their investigations, except for recommendations regarding termination. (*Id.* ¶¶ 449, 450.) Although Defendants counter with the fact that the Undersheriff and Inspector General review all investigations, Plaintiffs have presented Sheriff Sheahan's deposition testimony that he did not receive any written reports from the Inspector General about such investigations. (*Id.* ¶ 451.)

Also, Plaintiffs set forth additional evidence creating a genuine issue of material fact concerning the inadequacy of the reporting mechanisms within the CCDOC. Plaintiffs, for example, have presented evidence that officers routinely failed to report various incidents at the CCDOC and that IAD supervisors sometimes requested IAD investigators to change their findings. (*Id.* ¶¶ 470, 474; Pls.' Ex. 22, Holman Dep. at 170-71.) Viewing the facts and all reasonable inferences in favor of Plaintiffs, there is a genuine issue of material fact that Sheriff Sheahan was deliberately indifferent that the code of silence's known or obvious consequences would result in the deprivation of a constitutional right based on the inadequacy of the reporting mechanisms within the CCDOC.

As the Supreme Court explained in *Board of County Comm'rs v. Brown*, "[i]f a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on

notice that a new program is called for.  Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference' – necessary to trigger municipal liability."  *Id.* at 407.  Here, Plaintiffs have set forth competent evidence to create a genuine issue of material fact that the CCDOC's inadequate reporting mechanisms failed to prevent its correctional officers from committing constitutional torts**.**

C.    **Causal Link**

Finally, Plaintiffs must establish a direct causal link between the alleged code of silence and their constitutional injuries, namely, that the code of silence was the "moving force" behind their constitutional deprivation.  *Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 1208-09, 103 L.Ed.2d 412 (1989); *Arlotta v. Bradley Ctr.*, 349 F.3d 517, 522 (7th Cir. 2003).  "Moving force" is "when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983."  *Estate of Novack*, 226 F.3d at 531 (quoting *Monell,* 436 U.S. at 694); *see also Woodward*, 368 F.3d at 928.

Construing the evidence and all reasonable inferences in a light most favorable to Plaintiffs, they have presented definite, competent evidence creating a genuine issue of material fact that they were harassed and retaliated against for breaking the code of silence.  Fairley, for example, testified that on July 29, 2000 he saw correctional officers beat inmates in SI- 2 and consequently told the officers to stop beating the inmates.  After these inmates filed a lawsuit in state court, Plaintiffs informed other correctional officers and Division I personnel that they would tell the truth if asked about the July 29, 2000 incident.  Both Fairley and Gackowski testified that after the July 29, 2000 incident, certain correctional officers and supervisors

harassed and retaliated against them by "dry humping" them, calling them inmate lovers, physically threatening them, and falsifying reports about them.

Accordingly, Sheriff Sheahan has failed in his burden of establishing the lack of any genuine issue of material fact as to Plaintiffs' *Monell* claim. *See Celotex Corp. v. Catrett,* 477 U.S. at 323. The Court thus denies Sheriff Sheahan's Motion for Summary Judgment.

## III.    Civil Conspiracy Claim – Count II

Finally, Plaintiffs allege that Defendants conspired to deprive them of their constitutional right to free speech. To establish a Section 1983 claim through a civil conspiracy theory, Plaintiffs must demonstrate that (1) Defendants had an express or implied agreement to deprive Plaintiffs of their constitutional rights, and (2) Plaintiffs were deprived of their constitutional rights by Defendants' overt actions in furtherance of the agreement. *Williams v. Seniff,* 342 F.3d 774, 782 (7th Cir. 2003); *Scherer v. Balkema,* 840 F.2d 437, 442 (7th Cir. 1988). "To be liable as a conspirator you must be a voluntary participant in a common venture, although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." *Jones v. City of Chicago,* 856 F.2d 985, 992 (7th Cir. 1988).

Defendants contend that Plaintiffs have failed to set forth any evidence creating a genuine issue of material fact that Defendants reached an agreement to deprive Plaintiffs of their First Amendment rights. The Court agrees. Although Plaintiffs may establish a conspiracy through circumstantial evidence, such evidence cannot be speculative. *Seniff,* 342 F.3d at 785. As such, a civil conspiracy claim cannot survive summary judgment if the arguments and

supporting evidence are "vague, conclusionary and include no overt acts reasonably related to the promotion of the alleged conspiracy." *Amundsen v. Chicago Park Dist.,* 218 F.3d 712, 718 (7th Cir. 2000) (citation omitted).

Here, Plaintiffs' entire conspiracy argument consists of one paragraph, in which they make the following conclusory statement: "Accepting plaintiffs' facts as true, which the Court must do on summary judgment, there is no option but to find sufficient evidence of a conspiracy to engage in actions calculated to hinder plaintiffs' efforts to speak out and to discredit them when they did." (R. 553-2, Pls.' Corrected Resp. at 46.) This argument alone does not raise a genuine issue of material fact as to Plaintiffs' conspiracy claim. Therefore, the Court grants the Defendants' Motion for Summary Judgment as to Count II of the Second Amended Complaint.

## CONCLUSION

For these reasons, the Court grants in part and denies in part Defendant Sheriff Michael Sheahan's Motion for Summary Judgment. [R. 435-1.] The Court grants in part and denies in part Defendant Edward Byrne's and Defendant Dennis Andrews' Motions for Summary Judgment. [R. 429-1, 450-1.] Further, the Court grants in part and denies in part Defendants Evan Fermaint's, Noberto Bercasio's, Fred Coffey's and Ronald Prohaska's Motion for Summary Judgment. [R. 449-1.] The Court grants Defendant Juan Diaz's, Defendant Patrick Loizon's, and Gregory Ernst's Motions for Summary Judgment in their entirety. [R. 432-1, 433-1, 456-1.] Last, the Court grants in part and denies in part Defendant Timothy Kaufmann's and Saul Weinstein's Motion for Summary Judgment. [R. 434-1, 436-1.]

Date: May 4, 2006

**ENTERED**

AMY J. STEVE
United States District Court Judge